**FIRST NATIONAL CITY BANK**

v.

**The UNITED STATES.**

No. 471–72.

United States Court of Claims.

July 8, 1977.

James R. Rowen, New York City, attorney of record, for plaintiff; William J. Albinger, Jr., Shearman & Sterling, New York City, of counsel.

Kenneth R. Boiarsky, Washington, D.C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D.C., for defendant; Theodore D. Peyser, Jr., Donald H. Olson, Bruce W. Reynolds, Washington, D.C., of counsel.

Before DURFEE, Senior Judge, DAVIS and KASHIWA, Judges.

KASHIWA, Judge:

This tax refund action involving the determination of the proper exchange rate at

which to convert creditable foreign taxes paid in foreign currency from that currency into a U.S. dollar equivalent is before the court on defendant's motion for partial summary judgment on Counts I, II, and III of the petition. For the purposes of this motion only, defendant admits the factual allegations contained in plaintiff's petition and pretrial submission; accordingly, no genuine issue exists as to any material fact. Upon consideration of defendant's motion and plaintiff's opposition thereto and the exhibits of record, after briefing and oral argument, we conclude that plaintiff is required under I.R.C. § 905(c)[1] to adjust its foreign tax credit to reflect the U.S. dollar cost on the date of payment of the foreign taxes that plaintiff accrued on its return. Consequently, we grant defendant's motion for partial summary judgment.

Plaintiff ("Citibank"), a national banking association which conducts its banking business in New York State and through branches in many foreign countries, brought this action seeking refund of federal income taxes paid for the calendar years 1953 through 1964, relating particularly to the application of federal income taxes and tax credits to Citibank's income from its foreign branches.

Plaintiff employs the accrual method of accounting in keeping its books and accounts and in filing its federal income tax returns. Each of Citibank's foreign branches keeps its books and accounts in the currency of the country where the bank is located.[2] In connection with plaintiff's foreign branch banking operations, it is required to pay taxes to several foreign governments based upon the income earned in those countries. For this purpose income is computed in terms of foreign currencies, and the taxes are paid in those currencies. During each of the taxable years in issue, with a few exceptions, Citibank's foreign branches remitted to Citibank in the United States the amount of their after-foreign-tax branch profits.[3] The amounts representing branch profits that were retained to pay foreign income taxes were not remitted to the United States and were never converted into U.S. dollars.

For federal income tax purposes during the years in question, 1953 through 1964, Citibank reported all of its foreign branch profits as income and claimed credit under §§ 33 and 901 for the foreign income taxes imposed with respect to such foreign branch profits. In computing foreign branch profits and foreign income taxes paid for each of the years in question, Citibank reported its after-foreign-tax branch profits at the actual amounts of U.S. dollars received when the foreign currency was remitted to the United States and converted to U.S. dollars; and Citibank reported the branch profits retained for taxes by translating the foreign currency amounts into U.S. dollars at the average actual remittance rate of exchange[4] for the year in which the profits were reported. In determining its foreign tax credits, Citibank translated its foreign currency income tax payments made *before* the end of the taxable year (i. e., the year in which it reports the profits in respect of which the taxes are imposed) into U.S. dollars at the average actual remittance rate of exchange for that taxable year. Up to this point defendant agrees with plaintiff's

---

1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

2. For this purpose, all of Citibank's offices in one foreign country are considered one branch.

3. The term "after-foreign-tax branch profits" means the "unblocked" profits before foreign income taxes recorded on the books of the foreign branch (called "foreign branch profits") less the part of Citibank's foreign branch profits that is retained to pay foreign income taxes (called "branch profits retained for taxes"). The term "unblocked" income refers to income received in foreign countries that Citibank is not prevented under local law from remitting to the home office and on which taxation is not deferred under Mim. 6475, 1950–1 C.B. 50.

4. The term "average actual remittance rate of exchange" or "average remittance rate" means the rate of exchange obtained by dividing the total U.S. dollars actually received for foreign currency remitted out of foreign branch profits during the year by the total foreign currency which was actually remitted and converted into U.S. dollars during such year.

translating method, but here is where the harmony ends.

In determining its foreign tax credits, for those branches which retained funds to pay foreign income taxes, Citibank translated its foreign currency income tax payments made *after* the end of the taxable year into U.S. dollars at the average actual remittance rate of exchange for the taxable year. The instant controversy arises because the Commissioner of the Internal Revenue Service ("Commissioner"), relying upon his interpretation of § 905(c), translated these foreign tax payments made after the end of the taxable year into U.S. dollars at the actual rates of exchange on the dates of such payments. As a result, we are faced with the preliminary but principal question[5] of whether, when converting from foreign currency to U.S. dollars for the purpose of computing the allowable foreign tax credit with respect to foreign taxes accrued but not paid at the close of the taxable year, plaintiff is required under § 905(c) to utilize the prevailing exchange rate on the date when such taxes were actually paid as compared to the exchange rate upon which the year-end accrual of taxes was based.

Section 905(c)[6] provides, in part, as follows:

> If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Secretary or his delegate, who shall redetermine the amount of the tax for the year or years affected. * * *[7]

Defendant, focusing on this sentence, argues that the tax credit claimed by plaintiff for its branch's accrued foreign tax liability was only a tentative calculation which must be adjusted to the date-of-payment exchange rate whenever the foreign taxes are paid after the end of the year to which those taxes relate. Defendant relies upon case law,[8] administrative rulings,[9] and the works of two leading commentators.[10]

In defense of the method it uses, plaintiff argues that its method of translating foreign income tax payments is reasonable and proper in that foreign tax payments are reported at the same exchange rate as that used in reporting foreign branch profits, that its method satisfies § 446[11] in that it is a method of accounting which clearly reflects income and is the basis of which plaintiff regularly keeps its books, that its method has been consistently followed by plaintiff and has been accepted on audit by the I.R.S. for every one of the years 1940 through 1952, and that its method is consistent with the theory of a 1966 Closing Agreement between plaintiff and the Commissioner relating to the determination of devaluation losses resulting from the devaluation of foreign currencies. Furthermore, plaintiff contends that its method of translating foreign income tax payments is not proscribed by § 905(c). Plaintiff submits

---

5. This question is Count I of plaintiff's petition.

6. § 131(c) of the Internal Revenue Code of 1939.

7. The Tax Reform Act of 1976, Pub.L.No.94–455, § 1906(b)(13)(A), 90 Stat. 1834 (1976), substituted "Secretary" for "Secretary or his delegate" each place it appeared in the Code for tax years beginning after 1976.

8. *Comprehensive Designers Int'l, Ltd. v. Commissioner*, 66 T.C. 348 (1976); *Texas Co. (Caribbean) Ltd. v. Commissioner*, 12 T.C. 925 (1949).

9. S.M. 4081, IV–2 C.B. 201 (1925), superseded and reaffirmed in Rev.Rul. 73–506, 1973–2 C.B. 268.

10. Owens, The Foreign Tax Credit, § 7/3 (1961); Ravenscroft, Taxation and Foreign Currency, § 14/3.2 (1973).

11. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING

"(a) *General Rule.*—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

"(b) *Exceptions.*—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."

that the language, purpose, and history of § 905(c) evidence that Congress' only intent in enacting that section was to adjust the accrual for foreign taxes where the amount of foreign tax actually paid in foreign currency differed from the amount originally accrued and claimed as a credit when the U.S. tax return was filed. To plaintiff the words of the statute, "[i]f accrued taxes when paid differ", impliedly require an adjustment of the amount taken as a credit only when there is a difference in the amount of the taxes owing to the foreign government, not when there is a difference in exchange rates. Plaintiff postulates that its conclusion is supported by the fact that the Committee reports do not discuss foreign currency translations, and nothing else in the legislative history to the section suggests that Congress had in mind the question of adjusting foreign currency income tax payments based on differences in exchange rates.

Although we agree with the plaintiff that with relation to the exchange rate problem the legislative history cupboard is bare, we do not agree with plaintiff that its method of translating foreign currency payments is proper under the Code.

■■■ The foreign tax readjustment provision which first appeared in §§ 222(b) and 238(a) of the Revenue Act of 1918 [12] has been retained by Congress in subsequent Acts *in haec verba*. In 1925 the Solicitor of Internal Revenue published S.M. 4081,[13] which first announced defendant's position that the foreign tax shall be converted as of the date of payment in order to arrive at the amount actually paid in U.S. dollars.[14] We recognize that S.M. 4081 does not include an adequate rationale, but it does state a conclusion.

   \* \* \* [Section 238(a) of the Revenue Act of 1918] can mean but one thing, namely, that if upon final determination and payment of the foreign tax it is found that the amount actually paid differs from that accrued, the American tax liability shall be adjusted by allowing as a credit the amount actually paid. And the law having directed the adjustment of the amount accrued to the amount actually paid, the necessary inference is that the amount of the payment if made in Canadian money shall be converted into American money at the rate of exchange as of the date of payment, since this is the only way of arriving at the amount actually paid. \* \* \*

The amount of the credit should, therefore, be adjusted to the amount of the actual payment in terms of American dol-

---

12. Pub.L.No.254, ch. 18, 40 Stat. 1057, 1073, 1080–81 (1919). So far as material to this discussion, § 238 of the Revenue Act of 1918 reads as follows:

   SEC. 238. (a)

   \*    \*    \*    \*    \*    \*

   "If accrued taxes when paid differ from the amounts claimed as credits by the corporation, or if any tax paid is refunded in whole or in part, the corporation shall at once notify the Commissioner who shall redetermine the amount of the taxes due under this title and under Title III for the year or years affected, and the amount of taxes due upon such redetermination, if any, shall be paid by the corporation upon notice and demand by the collector, or the amount of taxes overpaid, if any, shall be credited or refunded to the corporation in accordance with the provisions of section 252." \* \* \*

13. *Supra* note 9.

14. It should be noted that in 1923 the Service published I.T. 1645, II–1 C.B. 141 (1923), which stated that:

   "A taxpayer who keeps his books and files his returns to the United States on the accrual basis should use the rate of exchange in effect on the last day of his taxable year in claiming a credit for taxes accrued to a foreign country." In 1925, however, S.M. 4081 limited that pronouncement:

   " \* \* \* the rule laid down in this I.T. [1645] should be limited to the case of a taxpayer filing its original return and estimating the foreign tax for the purpose of taking credit. When the tax is actually paid the rate of exchange to be used in adjusting the tax liability is the rate on the date of actual payment of the tax."

lars at the rate of exchange prevailing on the date of payment.[15]

We presume that Congress was aware of the administrative construction given to the foreign tax credit readjustment provision, and by reenactment of the statutory provision " * * * Congress must be taken to have approved the administrative construction and thereby to have given it the force of law"[16] We recognize, however, that the doctrine of legislative acquiescence is at best only an auxiliary tool for use in interpreting ambiguous statutory provisions.[17] But this is not a case where we are cloaking an administrative interpretive position with immunity from judicial examination because Congress has for some period failed affirmatively to act to change the interpretation given to an otherwise unambiguous statute.[18] Nor is this a case where no reliable inference as to Congress' intent can be drawn from reenactment of a statute because of a conflict between administrative and judicial interpretation of the statute at the time of its reenactment.[19] Here we have an unambiguous administrative pronouncement, adopted by the Solicitor in the early days of federal income tax legislation, in continuous existence since that time,[20] and approved by the courts, tacitly if not expressly, on many occasions. Although prior to *Comprehensive Designers International, Ltd.*[21] no case dealt specifically with

the choice of the proper date for conversion and therefore none is controlling for the instant controversy, *Brown,*[22] *Mead Cycle Co.,*[23] *Burns,*[24] and *Texas Co. (Caribbean) Ltd.*[25] approve of the use of the exchange rate on the date of payment of the foreign tax by an accrual basis taxpayer when there was a difference in the rate between the date of payment and the date of accrual.

In these circumstances, we consider that Congress, if it had considered the Service's interpretation erroneous, would have amended the section when it reenacted the statute; its failure to do so implies that the administrative pronouncement was not inconsistent with the intent of the statute. Nevertheless, we need not rest our conclusion solely upon the legislative concurrence doctrine. Two leading commentators[26] and the Tax Court[27] uniformly agree that the foreign tax credit must be adjusted by using the date-of-payment exchange rate when the taxes are paid after the end of the taxable year.

Focusing upon the statutory language of § 905(c) and the purpose of the foreign tax credit, Judge Tannenwald, in a well-reasoned opinion, concluded that a taxpayer who took the foreign tax credit by translating accrued foreign taxes at the rate of exchange prevailing at its fiscal year-end should adjust that credit "to reflect the

---

15. *Supra* note 9, at 202–203.

16. *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536 (1939).

17. *Helvering v. Reynolds,* 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438 (1941).

18. *Cf. Jones v. Liberty Glass Co.,* 332 U.S. 524, 533–34, 68 S.Ct. 229, 92 L.Ed. 142 (1947) (where Congress was not expected to make an affirmative move every time a lower court indulged in an erroneous interpretation).

19. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955).

20. Although S.M. 4081 was superseded by Rev. Rul. 73–506, *supra* note 9, the later ruling merely restated under the current statute and regulations the position of the earlier ruling.

21. *Comprehensive Designers Int'l, Ltd. v. Commissioner, supra* note 8.

22. *Brown v. Commissioner,* 1 B.T.A. 446 (1925).

23. *Mead Cycle Co. v. Commissioner,* 10 B.T.A. 887, 896–97 (1928).

24. *Burns v. Commissioner,* 12 B.T.A. 1209, 1226 (1928).

25. *Texas Co. (Caribbean) Ltd. v. Commissioner, supra* note 8.

26. See note 10.

27. See note 8.

dollar cost on the payment date of the foreign taxes." [28]

Plaintiff, in an attempt to distinguish its factual situation from *Comprehensive Designers*, argues that *Comprehensive Designers* did not involve a taxpayer who kept in foreign currency the branch profits retained to pay taxes. Plaintiff concedes that if its branches had converted all their profits (including those retained to pay taxes) into U.S. dollars and had subsequently purchased foreign currency at a lower exchange rate in a later year to pay their foreign income tax liability, then, in such a case, it would be proper for Citibank to take credit for the taxes paid at the prevailing rate on the date of payment.[29] However, plaintiff contends, when a taxpayer maintains in the foreign currency the branch profits retained to pay taxes, the same rate that is used to convert those branch profits (in this case the average remittance rate) should be used to translate the foreign currency tax payments. To plaintiff it is that rate which represents the actual dollar cost of the foreign currency that is paid out in foreign taxes and, accordingly, which reflects the tax expense incurred by the taxpayer.

The essence of plaintiff's assertion is that the consequences of an investment choice to retain foreign currency,[30] which proves to be unfortunate in retrospect, should be reimbursed by the Government through an alteration of the foreign tax credit. It should be noted, however, that the foreign tax credit provisions were not designed "to preserve the benefits of wise investments in dollars" or "to protect against unwise investments in foreign currency." [31] In our opinion, earmarked profits which are held in foreign currency do not help to justify plaintiff's assertion that the exchange rate for income purposes should be the same as the exchange rate for the foreign credit. Consequently, we do not find on this ground that plaintiff's case is distinguishable from *Comprehensive Designers.*

Nevertheless, in another attempt to distinguish its factual situation from *Comprehensive Designers*, plaintiff contends that that case did not involve a taxpayer who consistently had followed a reasonable method of translating foreign currency payments as plaintiff has done in the instant case. Plaintiff asserts that it has adopted a "method of accounting" for the foreign tax credit by consistently translating its branch's foreign tax liabilities at an average remittance rate.

Our short answer to plaintiff's assertion is that it is immaterial to plaintiff's case whether the petitioner in *Comprehensive Designers* consistently followed a method of translating foreign currency payments. Section 905(c) provides a rule governing the proper computation of the foreign tax credit which was not followed. By requiring a taxpayer to adjust the foreign tax credit to comply with § 905(c) so as to reflect the U.S. dollar cost of the foreign taxes on the payment date, the taxpayer is not deemed to have changed its accounting method. The Treasury Regulations under § 446 expressly provide that "[a] change in method of accounting does not include correction of * * * errors in the computation of tax

28. *Comprehensive Designers Int'l, Ltd. v. Commissioner, supra* note 8, at 356.

29. Plaintiff recognized this fact in a special case involving Brazilian taxes for the year 1962. In that case plaintiff had converted into U.S. dollars the foreign branch profits retained to pay such taxes; as such, plaintiff claimed credit for the taxes when paid, translated at the date-of-payment rate.

30. Plaintiff alludes to the fact that its branches have idle foreign currency "in hand." However, its pretrial submission speaks only of "retained profits," which we deem may be like

"retained earnings." Similarly, the pretrial submission speaks of a "reserve for taxes" but no facts are presented to show if that refers to foreign cash actually set aside, or instead refers to the liability account for foreign taxes. Nevertheless, if the branches are sitting with idle foreign currency "in hand," it is by their choice that they have not converted that currency into U.S. dollars.

31. Owens, *supra* note 10, § 7/3C, at p. 458, and n. 59.

liability (such· as errors in computation of the foreign tax credit * * *)." [32]

◼ For the above reasons, we deem that *Comprehensive Designers* is applicable to the instant controversy and supports the Government's position that the foreign tax credit, available to Citibank for the calendar years 1953 through 1964, should be adjusted to reflect the U.S. dollar cost on the payment date of the foreign taxes that plaintiff accrued on its returns. No double taxation occurs to plaintiff, despite the fact that the branch profits retained to pay taxes are converted at a different exchange rate than the taxes themselves.[33] Moreover, the conversion of creditable foreign tax as of the date of payment equates the positions of the accrual and cash basis taxpayers under the foreign tax credit system with respect to the effect of an exchange fluctuation between the time the foreign tax accrues and the time it is paid; this seems proper to us.

Although we interpret § 905(c) to require a taxpayer to translate its accrued foreign tax credit at the date-of-payment exchange rate, nevertheless, we must address plaintiff's contention that in the instant case the I.R.S. is estopped from asserting deficiencies against plaintiff for the years in question because the Service accepted plaintiff's translation method.

Plaintiff points to the fact that the I.R.S., for each year 1940 through 1952, audited plaintiff's tax returns. In the course of each such audit, the revenue agents made adjustments to the foreign tax credits claimed by plaintiff. In making those adjustments, the agents had used, until the present controversy, plaintiff's translation method—the average remittance rate—in respect of taxes accrued at year-end and not paid until a later year; they had not made adjustments based on date of pay-

ment rates. In addition, plaintiff points to the fact that on December 13, 1966, it and the Commissioner negotiated a Closing Agreement relating to the determination of devaluation losses resulting from the devaluation. of foreign currencies. To plaintiff, the Closing Agreement is pertinent to the instant controversy in two respects: first, the Commissioner accepted plaintiff's method of translating foreign currency tax payments in the returns that were settled incident to the Closing Agreement, which acceptance, to plaintiff, is evidence of the Commissioner's approval of such method; and second, the defendant's position in the instant case, that foreign tax payments made after year-end should be translated at rates different from the rates applied to the foreign branch income retained to pay such taxes, is inconsistent with the theory of the Closing Agreement, while plaintiff's position is consistent with such theory.

◼ Essentially, plaintiff's estoppel theory is based upon its assertion that the Service upon audit accepted plaintiff's translation method and embodied the acceptance in plaintiff's 1966 Closing Agreement. Although plaintiff's theory is not supported by the factual allegations on record, even if the court were to conclude that the Service upon audit reviewed and accepted plaintiff's use of the average remittance rate for foreign tax credit purposes for the years 1940 through 1952, the Government is neither estopped nor otherwise barred from applying the date of payment translation rate to the years in issue.[34]

With relation to the 1966 Closing Agreement, plaintiff does not contend that either the Closing Agreement or the controversy leading up to that Agreement is in any way directed to the foreign tax credit or the rate to be used in translating foreign taxes for that purpose. In fact, neither the 1966

---

**32.** Treas.Reg. § 1.446–1(e)(2)(ii)(*b*) (1970).

**33.** *See* Owens, *supra* note 10, § 7/3C.

**34.** *Automobile Club of Mich. v. Commissioner*, 353 U.S. 180, 183–85, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *Eckstein v. United States*, 452 F.2d

1036, 1050, 196 Ct.Cl. 644, 667–68 (1971); *Union Equity Coop. Exch. v. Commissioner*, 481 F.2d 812, 817 (10th Cir. 1973), *aff'g* 58 T.C. 397 (1972), *cert. denied*, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973).

Closing Agreement nor any of its exhibits refer to the foreign tax credit, its computation, or the exchange rate to be used therefor. Consequently, we find it inconceivable to subscribe to plaintiff's assertion that its translation method for tax credit purposes is consistent with an unexpressed theory which plaintiff wishes us to presume was behind the 1966 Agreement, even though that Agreement neither concerns nor refers to the foreign tax credit or a translation rate.

For the foregoing reasons, we hold that the Government is not estopped from asserting deficiencies against plaintiff for the years in question. Accordingly, we grant defendant's motion for partial summary judgment on Count I.

Plaintiff's principal position was set forth in Count I of its petition. Since we rejected plaintiff's principal position and hold that taxes paid after year-end should be translated at date of payment rates, we must consider plaintiff's alternative positions.

■ In Count II plaintiff submits that if foreign taxes paid after year-end should be translated at date-of-payment rates, then payments made prior to year-end should also be translated at date-of-payment rates. We do not agree. The cases and administrative rulings uniformly agree that for purposes of reporting a creditable foreign tax, the exchange rate to be used in claiming the credit should be the same as that used in computing income. While the tax credit is to be claimed in this manner, § 905(c) requires retrospective adjustment using the date-of-payment exchange rate when foreign taxes are paid after the end of the year in which the income is reported. However, this statutory adjustment under § 905(c), in our view, is not applicable to foreign taxes which are paid before the end

of the year in which the income is reported. Our conclusion is borne out not only by the statutory heading of § 905(c), which states "Adjustments on payment of accrued taxes",[35] but also by the statutory language of that section.

■ In Count III plaintiff's alternate position to those expressed in Counts I and II is that its branch profits retained for taxes (its unremitted income), from which such foreign income tax payments are made, should be translated at the same exchange rate that the foreign taxes paid after year-end are translated, *viz.*, date-of-payment exchange rates. Essentially, plaintiff proposes that a post year-end adjustment, similar to that made for tax credit purposes under § 905(c), should be made to the translation rate used in reporting unremitted income. What plaintiff has failed to realize is that unlike the translation rate for the foreign tax credit, the translation rate for income is a method of accounting. As such, plaintiff's proposed adjustment is not allowable without the consent of the Commissioner.[36] Moreover, the use of an after year-end translation rate to translate income reportable during the year is a violation of both annual and accrual accounting principles.[37] In addition, the statutory adjustment under § 905(c) has no application to the translation rate used in reporting income.

## CONCLUSION

For the foregoing reasons, we grant defendant's motion for partial summary judgment and dismiss plaintiff's petition as to Counts I, II, and III.

---

**35.** We recognize that the title of a section may be considered as an aid to the interpretation of an ambiguous text, but may not be used to limit or set at naught the plain meaning of the text. *Knowlton v. Moore,* 178 U.S. 41, 65, 20 S.Ct. 747, 44 L.Ed. 969 (1900); *Brotherhood of R. R. Trainmen v. Baltimore & O. R. R.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646

(1947); *Prudential Ins. Co. of America v. United States,* 319 F.2d 161, 162 Ct.Cl. 55 (1963).

**36.** § 446(e).

**37.** *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725 (1944).