**HARRAH'S CLUB**

v.

**The UNITED STATES.**

No. 137–77.

United States Court of Claims.

Sept. 23, 1981.

John P. Sande, III, Reno, Nev., atty. of record, for plaintiff.

James L. Malone, III, Washington, D. C., with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before DAVIS, NICHOLS and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's withdrawal of notice of intention to except and request, filed August 3, 1981, that the court adopt as the basis for its judgment in this case, the recommended decision of Trial Judge David Schwartz, filed May 22, 1981, pursuant to Rule 134(h). Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as here-

inafter set forth *, it hereby grants plaintiff's request and adopts the recommended decision as the basis for its judgment in this case. Accordingly, plaintiff is not entitled to recover, and the petition is dismissed.

### OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

The issue in this suit for a refund of income taxes is the propriety of the deduction from gross income, as a current expense or as an allowance for depreciation, of the taxpayer's costs of restoring antique automobiles.

The taxpayer, plaintiff Harrah's Club of Reno, operates hotels and gambling casinos in Reno, Nevada. To attract patrons, taxpayer maintains a museum of antique automobiles and other vehicles, known as Harrah's Automobile Collection (HAC). Approximately 1,000 antique vehicles are exhibited, many of them restored to original or near original condition. HAC employs 150 people, and is housed in a 10-acre complex which includes showrooms, restoration workshops and an extensive research library for use in restoration planning.

The HAC is successful in its intended purpose. Almost 200,000 persons visited it during taxpayer's fiscal year 1971, the year involved. HAC vehicles, moreover, occasionally participate in antique auto races or are otherwise displayed in competitions for appearance and perfection in restoration. The 94 restored vehicles whose costs are involved in this case are often the subject of widely publicized photographs. All this brings much publicity for taxpayer's enterprises.

The restoration of antique autos seeks to replicate original appearance. The most elaborate restoration recreates the original automobile in every particular, including operational ability. The restorations whose costs are in issue are so detailed and painstaking, taxpayer says, that the total cost of the restored vehicle is greater than its mar-

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

ket value. The Government does not dispute this proposition, and it is accepted, although the assumed market would seem to exclude those who might believe that the publicity value of such highly restored cars and the recognized premium value of HAC-restored cars compensate for their excess of cost over market value. If there are no such buyers, it may be that there is no market for cars restored in the HAC manner.

In any event, the issue is the proper tax treatment of the excess of total restored-vehicle costs over market value. Taxpayer contends that these "excess restoration costs" are deductible as a business expense in the year of the restoration, and if not, then they are depreciable in five, or at most ten years. Alternatively, it is urged that the Commissioner, having agreed to a settlement in earlier years on the basis of depreciation of the excess restoration costs, is estopped now to argue otherwise.

Trial of the case included a viewing of the HAC premises and the vehicles on display, among them many of the cars in issue, testimony as to individual restorations and expert testimony on valuations and restorations generally. Detailed findings of fact and conclusions of law have been made, and accompany this opinion. Those relevant to the decision are stated herein. On the basis of the findings and conclusions, the taxpayer's contentions are for the reasons which follow rejected, and the complaint is dismissed.

## I

### The Claim of Estoppel

The estoppel argument may be summarily disposed of. The agreement with the Commissioner, said to create an estoppel, related to years earlier than 1971. No agreement was made bearing on tax consequences in the taxpayer's fiscal year 1971, the year presently involved. Taxpayer's accountant conceded this on the stand; no agreement purporting to work an estoppel was put in evidence.

■ It is settled that each tax year is another matter and that the Commissioner may challenge in a succeeding year what he condoned or agreed to in a former year. *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *First National Bank of New York v. United States,* 214 Ct.Cl. 585, 596–98, 557 F.2d 1379, 1386–87 (1977); *Union Equity Cooperative Exchange v. Commissioner,* 481 F.2d 812 (10th Cir. 1973), *cert. denied,* 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973); 10 Mertens, *Law of Federal Income Taxation,* § 60.14.

## II

### Deductibility as Current Expenses of the Excess Restoration Costs

■ Taxpayer maintains that the excess restoration costs are current expenses of repair, deductible as ordinary and necessary expenses under section 162 of the Internal Revenue Code. The precise contention is that the difference between basis, i. e., original cost plus costs of restoration, and market value after restoration—which taxpayer calls "excess restoration costs"—is the cost of an ordinary repair and therefore a deductible business expense. This proposition is without support in tax code or case law.

Section 263 of the Code, on capital expenditures, prohibits deductions for "[a]ny amount paid out . . . for permanent improvements or betterments made to increase the value of any property." Deductible repair costs are defined in the regulations as "[t]he cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition." Conversely, "[r]epairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property" may not be deducted, but are to be capitalized and depreciated in accordance with section 167 of the Code. Treas.Reg.

§ 1.162–4 (1958).[1] By the test of the foregoing descriptions of what is and what is not a deductible expense, the costs of the restorations here involved are not deductible costs of repair, but capital items, nondeductible except insofar as they are depreciable.

The HAC restorations involve extensive showroom-or-better quality replacements and additions of body, engine, upholstery, lights and paint. Each restoration is preceded by historical research into the specifications of the original vehicle. Restoration is then carried out with meticulous attention to every detail revealed in the research, at great cost. Upholstery and paint are reproduced as they were originally. Entire portions of the body and engine, down to individual engine parts, are renewed, to the extent of making castings from borrowed samples of parts whose replacements cannot be found; the taxpayer's word for this last is "remanufactured." HAC restorations have such an excellent reputation for quality that they add a premium value to the HAC-restored vehicle.

These restorations are held to be "permanent improvements or betterments" which are made to increase the value (§ 263, I.R.C.) and which in fact do "materially add to the value" of the vehicles. They are also "in the nature of replacements," for they "arrest deterioration and appreciably prolong the life" of the vehicles. Treas.Reg. § 1.162–4, note 1. Better methods for arresting deterioration are used in the restoration than were used in the original manufacture.

By no stretch of imagination can the restorations be described as the "incidental repairs" deductible under section 1.162–4 of the regulations as intended to "keep [the

vehicle] in an ordinarily efficient operating [i. e., pre-restoration] condition." Note 1. Before restoration, the vehicles are old cars in every state of dilapidation. On restoration they become strikingly handsome antiques in mint condition, in appearance or in every respect, mechanical and otherwise. Before restoration they were admittedly capital assets and on restoration they are doubly capital assets because they have been very substantially improved, bettered, increased in value and given a prolonged life.

Accordingly, the costs of restoration, whether bringing the vehicle's total cost above or below its value in the market, cannot be deducted, and must rather be capitalized.

### III

### Depreciation of the "Excess Restoration Costs"

■ If not deductible, the taxpayer argues alternatively, then the "excess restoration costs" should be held depreciable over the period in which the restoration can be estimated to be useful in the business of the taxpayer.

Depreciation, in tax law, is "the exhaustion, wear and tear, and obsolescence of property used in the trade or business" of the taxpayer. The depreciation deduction is the annual reasonable allowance for such exhaustion, wear and obsolescence. The aggregate of the depreciation deductions is the difference between cost or basis and salvage value at the end of the estimated useful life of the depreciable property. I.R.C. § 167(a); Treas.Reg. § 1.167(a)–1 (1964).[2]

1. Treas.Reg. § 1.162–4 (1958) provides:
   "Repairs. The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the

extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept."

2. § 1.167(a)–1 Depreciation in general.
   "(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of

Taxpayer would separate the excess restoration costs, said to be a "separate and identifiable asset," from the remainder of the restoration costs and from the cost of the unrestored vehicle. Then, on the basis of testimony by its promotion manager, taxpayer ascribes to this identified asset an estimated useful life of five, or if not five, then ten years.

Only the first of several difficulties with this argument is that the excess restoration costs are not an asset capable of separation from the rest of the costs or the unrestored vehicle. Costs, of course, are not an asset. As for the restoration itself, it pervades the vehicle. Moreover, each restoration is different. Some restorations replace body parts or frames, some floor boards, some upholstery, fenders, engine covers, lights, tires, paint. Most or all replace a unique combination of these elements.

Once accomplished, a restoration cannot be severed from the vehicle. Nor can it be separately identified. In this respect, a restoration is wholly unlike an identifiable component of a building such as a plumbing or electrical system, as in *Shainberg v. Commissioner*, 33 T.C. 241 (1959).

Further, neither the restored vehicle nor its restoration has a useful life, in taxpayer's business, capable of being estimated. Under the regulation on depreciation, a useful life capable of being estimated is indispensable for the institution of a system of depreciation. Treas.Reg. § 1.167(a)–1(b) (1964). Property with an indeterminate life is nondepreciable. *Niagara Mohawk Power Corp. v. United States*, 207 Ct.Cl. 576, 585, 525 F.2d 1380, 1386 (1975), *reh. denied*, 207 Ct.Cl. 594 (1976). Restoration increases indefinitely the life of an antique car. One

vehicle restored 30 years ago is on display at HAC, without deterioration beyond the need for replacement of tires. No restored car in the Collection has ever needed re-restoration, been withdrawn from display because of deterioration or is likely to be so withdrawn. None has been sold, with one exception for a duplicate no longer desired. Even unrestored vehicles have without deterioration been on display at the Smithsonian Institution, in a harsher environment than HAC's showrooms, for 40 to 50 years.

Those few HAC cars occasionally entered in actual races are rarely so used and are, before and after the race, given ordinary repair and maintenance. Any damage to restored cars in connection with competitions of antique autos is a matter for repair, not depreciation. Taxpayer has stopped the occasional use of a few restored cars to transport important patrons to and from the Collection; findings cannot be made as to the duration of the practice or its effect.

The evidence establishes that there is no limit on the useful life of a restored car or other vehicle as a museum object. There is good reason to believe that the 94 restored vehicles involved in this case will, with only normal maintenance, have an indefinite life in the taxpayer's trade or business, a museum. The vehicles are kept in a humidity-controlled environment and need remarkably little repair or maintenance beyond occasional mending of a crack in a wood part.

This is not to say that the vehicles will last forever. It is to say that no limit can be put on the use of the vehicles as museum objects, and thus that the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business is indefinite. *See* Treas.Reg. § 1.167(a)–1(b).

property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and § 1.167(g)–1. An asset shall not be depreciated below a reasona-

ble salvage value under any method of computing depreciation. However, see section 167(f) and § 1.167(f)–1 for rules which permit a reduction in the amount of salvage value to be taken into account for certain personal property acquired after October 16, 1962. See also paragraph (c) of this section for definition of salvage. The allowance shall not reflect amounts representing a mere reduction in market value. See section 179 and § 1.179–1 for a further description of the term 'reasonable allowance.' "

No credible evidence supports the assertions of ten-year and five-year estimates of useful life. The ten-year estimate is not based on any hard facts, and is contradicted by the abundant evidence as to the longer lives of restored vehicles in museums. The five-year estimate is based on no more than the remark of a promotion manager that after four or five years of intensive exposure of a car, "it can take its place in the museum and we'll take something else." The shift from one car to another for promotional use, possible because taxpayer has an abundance of choices, does not prove the loss of promotional value of the replaced car. Moreover, the witness did not mean to deny the continuing life as a museum display object, which is taxpayer's primary use of the vehicles.

Recognition of both a short promotional life and a long museum life would presumably require a division into two parts of the basis of the restored vehicle, and different periods of depreciation for the same asset as useful in taxpayer's business for different purposes. Such a bifurcation would create a phenomenon unknown in tax law. Even if conceivably valid, there is no basis in the record for an allocation as between the asset as a museum display object and as a promotional object.

A variation on the assertion of a short life is that excess restoration cost is an intangible, to be depreciated over its five-year life as a promotional asset. In taxpayer's words, "This analysis reconstitutes the restoration costs into the price not for paint, leather, wheel bearings, etc., but for a promotional display with a useful life derived from novelty, perfection and other attributes appealing to the public for off-site and periodical promotion." The value, that is, the novelty, is said to be exhausted in five years "and then [taxpayer continues] the vehicle is reduced to a shopworn but otherwise authentic representation of the original version of nuts, bolts and paint comprising an operable vehicle."

No amount of such fanciful "reconstitution" can change a restored car or a restoration into an intangible. The tangible quality of the restoration is graphically described by taxpayer itself, in its argument for an investment credit: "The restoration ... consists of placing new tangible property on old tangible property; viz., a new fender ... on an old vehicle, ...." etc.[3] The assertion of a five-year life, even as a promotional device, has already been commented on. The vehicle is at no time, much less in five years, reduced to a shopworn condition.

Once the useful life of the vehicle as an asset used in taxpayer's business is seen to be indefinite, the asset of course cannot be given a salvage value as of the end of an estimated period of usefulness. Salvage is the amount realizable at the end of the useful life in taxpayer's business. These vehicles will have as much, if not more, value in the future as now. Without a salvage value, there can be no allowance for depreciation.

The taxpayer seeks to avoid the problem of a salvage value with the remarkable statement that "Since [the] excess restoration costs have no value when completed they can have none when exhausted ten years hence. Thus the salvage value of the excess restoration costs, constituting a separate and identifiable asset, is zero." Taxpayer has itself contradicted this assertion. Speaking of these same excess restoration costs, taxpayer says, "This is a value which [taxpayer] creates for its own use, which it

---

**3.** The argument for an investment credit urges tangibility as follows:

"First, the restoration in itself is tangible personal property. It consists of placing new tangible property on old tangible property; viz., a new fender will be placed on an old vehicle, or new wheel bearings will be placed in the wheels of an old vehicle, or new pistons will be placed within the rebored cylinders of an old motor block, complete with new pistons rings, new connecting rods, and perhaps a new crankshaft. Also, new tires will be placed on old wheels, new paint will be placed on an old body, and labor will be employed both to make the new tangible object and to put it in place in or on the vehicle. Thus the entire restoration cost is for new tangible property which is either constructed by the taxpayer or purchased by the taxpayer and put in or on the vehicle by the taxpayer's employees."

does use, and which is usable particularly by itself." Again, "The value is a promotional value, of particular and unique use to a business which cannot advertise its principal source of revenue, gaming, in its principal markets."

The excess restoration costs have, indeed, a double value. As a part of the restoration costs, they matter-of-factly increase the value of the unrestored car by making it a more attractive display, better able to draw patrons to taxpayer's hotels and casinos. (The trial judge found the restored cars fascinating.) And by the very extravagance or excessiveness of their costs, the restorations add a cachet to the HAC vehicles and thereby further promote the taxpayer's business. Barnum was neither the first nor the last to exploit the drawing power of the phrase, "Brought to you at g-r-r-r-reat and untold cost."

Another contention of the taxpayer, mentioned and then seemingly withdrawn, is that the entire cost of restoration, not merely the excess restoration costs, is depreciable. The ground offered is that after five or ten years, the salvage value of the entire restored car is zero. This contention, if made, is rejected on the grounds already stated concerning the salvage value of the excess restoration costs.

Given the indefinite life of the restored vehicles, if a value at the end of the period of usefulness were to be stated, it would be the same value as at the beginning. Values of these restored vehicles, incidentally, have steadily increased to the tax year involved, 1971, and as of that time were expected by the expert witnesses to continue to increase.

For all these reasons, a depreciation allowance deduction for the excess restoration costs is out of the question.

None of the contentions advanced by taxpayer in support of its claim for a refund has merit. The complaint should be dismissed.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.