

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-1995

# Liddle v Comm IRS

Precedential or Non-Precedential:

Docket 94-7733

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Liddle v Comm IRS" (1995). *1995 Decisions.* Paper 248.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/248

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-7733


BRIAN P. LIDDLE; BRENDA H. LIDDLE

v.

COMMISSIONER OF THE INTERNAL REVENUE SERVICE,

Appellant


ON APPEAL FROM A DECISION OF
THE UNITED STATES TAX COURT
(No. 92-2126)

_____

Argued June 15, 1995
Before: STAPLETON, McKEE, Circuit Judges,
and ROSENN, Senior Circuit Judge

(Opinion filed: September 8, 1995 )

LORETTA C. AGRETT, ESQ.
Assistant Attorney General

GARY R. ALLEN, ESQ.
RICHARD FARBER, ESQ.
EDWARD T. PERELMUTER, ESQ. (Argued)
Attorneys
Tax Division
Department of Justice
P.O. Box 502
Washington, D.C.  20044

Attorneys for Appellant

DAVID LYLE SEGAL, ESQ. (Argued)
JEFFRY H. HOMEL, ESQ.
121 South Broad Street
Suite 1700
Philadelphia, PA  19107

Attorneys for Appellees

1

McKEE, <u>Circuit Judge</u>

In this appeal from a decision of the United States Tax Court we are asked to decide if a valuable bass violin can be depreciated under the Accelerated Cost Recovery System when used as a tool of trade by a professional musician even though the instrument actually increased in value while the musician owned it. We determine that, under the facts before us, the taxpayer properly depreciated the instrument and therefore affirm the decision of the Tax Court.

## I.

Brian Liddle, the taxpayer here, is a very accomplished professional musician. Since completing his studies in bass violin at the Curtis Institute of Music in 1978, he has performed with various professional music organizations, including the Philadelphia Orchestra, the Baltimore Symphony, the Pennsylvania ProMusica and the Performance Organization.

In 1984, after a season with the Philadelphia Orchestra, he purchased a 17th century bass violin made by Francesco Ruggeri (c. 1620-1695), a luthier who was active in Cremona, Italy. Ruggeri studied stringed instrument construction under Nicolo Amati, who also instructed Antonio Stradivari. Ruggeri's other contemporaries include the craftsmen Guadanini and Guarneri. These artisans were members of a group of instrument makers known as the Cremonese School.

Liddle paid $28,000 for the Ruggeri bass, almost as much as he earned in 1987 working for the Philadelphia Orchestra. The instrument was then in an excellent state of restoration and had no apparent cracks or other damage. Liddle insured the instrument for its then-appraised value of $38,000. This instrument was his principal instrument and he used it continuously to earn his living, practicing with it at home as much as seven and one-half hours every day, transporting it locally and out of town for rehearsals, performances and auditions. Liddle purchased the bass because he believed it would serve him throughout his professional career -- anticipated to be 30 to 40 years.

Despite the anticipated longevity of this instrument, the rigors of Liddle's profession soon took their toll upon the bass and it began reflecting the normal wear and tear of daily use, including nicks, cracks, and accumulations of resin. At one point, the neck of the instrument began to pull away from the body, cracking the wood such that it could not be played until it was repaired. Liddle had the instrument repaired by renown artisans. However, the repairs did not restore the instrument's "voice" to its previous quality. At trial, an expert testified for Liddle that every bass loses mass from use and from oxidation and ultimately loses its tone, and therefore its value as a performance instrument decreases. Moreover, as common sense would suggest, basses are more likely to become damaged when used as performance instruments than when displayed in a museum. Accordingly, professional musicians who use valuable instruments as their performance instruments are exposed to financial risks

3

that do not threaten collectors who regard such instruments as works of art, and treat them accordingly.

There is a flourishing market among nonmusicians for Cremonese School instruments such as Mr. Liddle's bass. Many collectors seek primarily the "label", i.e., the maker's name on the instrument as verified by the certificate of authenticity. As nonplayers, they do not concern themselves with the physical condition of the instrument; they have their eye only on the market value of the instrument as a collectible. As the quantity of these instruments has declined through loss or destruction over the years, the value of the remaining instruments as collectibles has experienced a corresponding increase.

Eventually, Liddle felt the wear and tear had so deteriorated the tonal quality of his Ruggeri bass that he could no longer use it as a performance instrument. Rather than selling it, however, he traded it for a Domenico Busan 18th century bass in May of 1991. The Busan bass was appraised at $65,000 on the date of the exchange, but Liddle acquired it not for its superior value, but because of the greater tonal quality.

Liddle and his wife filed a joint tax return for 1987, and claimed a depreciation deduction of $3,170 for the Ruggeri bass under the Accelerated Cost Recovery System ("ACRS"), I.R.C. §168.[1] The Commissioner disallowed the deduction asserting that the "Ruggeri bass in fact will appreciate in value and not

---

[1] Because the bass viol was placed in service in 1984, the Internal Revenue Code applicable to that year governs this case. Thus, our analysis is governed by I.R.C. § 168 as it existed prior to 1987.

4

depreciate."  Accordingly, the Commissioner assessed a deficiency of $602 for the tax year 1987.  The Liddles then filed a petition with the Tax Court challenging the Commissioner's assertion of the deficiency.  A closely divided court entered a decision in favor of the Liddles. 103 T.C. 285 (1994).  This appeal followed.[2]

## II.

The Commissioner originally argued that the ACRS deduction under § 168 is inappropriate here because the bass actually appreciated in value.  However, the Commissioner has apparently abandoned that theory, presumably because an asset can appreciate in market value and still be subject to a depreciation deduction under tax law.  Fribourg Navigation Co. v. Commissioner, 383 U.S. 272, 277 (1966) ("tax law has long recognized the accounting concept that depreciation is a process of estimated allocation which does not take account of fluctuations in valuation through market appreciation."); Noyce v. Commissioner, 97 T.C. 670 (1991) (taxpayer allowed to deduct depreciation under § 168 on an airplane that appreciated in economic value by 27 percent from the date of purchase to the time of trial).

---

[2]    Our review of the Tax Court's conclusions of law is plenary; however, we review the court's factual findings under a clearly erroneous standard.  Armstrong World Industries, Inc. v. Commissioner, 974 F.2d 422, 430 (3d Cir. 1992); National Starch and Chemical Corp. v. Commissioner, 918 F.2d 426, 432 (3d Cir. 1990), aff'd, 503 U.S. 79 (1992).

5

Here, the Commissioner argues that the Liddles can claim the ACRS deduction only if they can establish that the bass has a determinable useful life. Since Mr. Liddle's bass is already over 300 years old, and still increasing in value, the Commissioner asserts that the Liddles can not establish a determinable useful life and therefore can not take a depreciation deduction. In addition, the Commissioner argues that this instrument is a "work of art" which has an indeterminable useful life and is therefore not depreciable.

In United States v. Ludey, 274 U.S. 295 (1927), the Supreme Court explained the depreciation deduction as follows:

> The depreciation charge permitted as a deduction from the gross income in determining the taxable income of a business for any year represents the reduction, during the year, of the capital assets through wear and tear of the plant used. The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost.

274 U.S. at 300-301. Prior to 1981, Section 167 of the Internal Revenue Code, 26 U.S.C. § 167, governed the allowance of depreciation deductions with respect to tangible and intangible personalty. Section 167 provided, in relevant part, as follows:

> § 167. DEPRECIATION
>
> (a) General Rule. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) --
>
>> (1) of property used in the trade or business, or
>>
>> (2) of property held for the production of income.

26 U.S.C. § 167(a). The regulations promulgated under § 167 provided that in order to qualify for the depreciation deduction, the taxpayer had to establish that the property in question had a determinable useful life. Treas. Reg. §§ 1.167(a) and (b). The useful life of an asset was not necessarily the useful life "inherent in the asset but [was] the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business. . . ." Treas. Reg. § 1.167(b). Nonetheless, under § 167 and its attendant regulations, a determinable useful life was the *sine qua non* for claiming the deduction. See, Harrah's Club v. United States, 661 F.2d 203, 207 (Ct. Cl. 1981) ("Under the regulation on depreciation, a useful life capable of being estimated is indispensable for the institution of a system of depreciation.")

Under § 167, the principal method for determining the useful life of personalty was the Asset Depreciation Range ("ADR") system. Personalty eligible for the ADR system was grouped into more than 100 classes and a guideline life for each class was determined by the Treasury Department. See, Treas. Reg. §1.167(a)-11. A taxpayer could claim a useful life up to 20 percent longer or shorter than the ADR guideline life. Treas. Reg. § 1.167(4)(b). The ADR system was optional with the taxpayer. Tres. Reg. § 1.167(a)-11(a). For personalty which was not eligible for ADR, and for taxpayers who did not choose to use ADR, the useful life of an asset was determined according to the unique circumstances of the particular asset or by an agreement between the taxpayer and the Internal Revenue Service. STAFF OF THE JOINT COMMITTEE ON TAXATION, GENERAL EXPLANATION OF THE ECONOMIC RECOVERY TAX

7

ACT OF 1981, 97th Cong., reprinted in INTERNAL REVENUE ACTS, 1980–1981, at 1441 (1982).

In 1981, convinced that tax reductions were needed to ensure the continued economic growth of the country, Congress passed the Economic Recovery Tax Act of 1981, P.L. 97–34 ("ERTA"). Id. at 1391.  It was hoped that the ERTA tax reduction program would "help upgrade the nation's industrial base, stimulate productivity and innovation throughout the economy, lower personal tax burdens and restrain the growth of the Federal Government."  Id.  Congress felt that prior law and rules governing depreciation deductions need to be replaced "because they did not provide the investment stimulus that was felt to be essential for economic expansion."  Id. at 1449.  Further, Congress believed that the true value of the depreciation deduction had declined over the years because of high inflation rates.  Id.  As a result, Congress believed that a "substantial restructuring" of the depreciation rules would stimulate capital formation, increase productivity and improve the country's competitiveness in international trade.  Id.  Congress also felt that the prior rules concerning the determination of a useful life were "too complex", "inherently uncertain" and engendered "unproductive disagreements between taxpayers and the Internal Revenue Service."  Id.   To remedy the situation, Congress decided

> that a new capital cost recovery system should be structured which de-emphasizes the concept of useful life, minimizes the number of elections and exceptions and is easier to comply with and to administer.

Id.

8

Accordingly, Congress adopted the Accelerated Cost Recovery System ("ACRS") in ERTA. The entire cost or other basis of eligible property is recovered under ACRS, eliminating the salvage value limitation of prior depreciation law. GENERAL EXPLANATION OF THE ECONOMIC RECOVERY TAX ACT OF 1981 at 1450. ACRS was codified in I.R.C. § 168, which provided, in relevant part, as follows:

> § 168. Accelerated cost recovery system
>
> (a) Allowance of Deduction. –- There shall be allowed as a deduction for any taxable year the amount determined under this section with respect to recovery property.
>
> (b) Amount of Deduction. –-
>
> (1) In general.-- Except as otherwise provided in this section, the amount of the deduction allowable by subsection (a) for any taxable year shall be the aggregate amount determined by applying to the unadjusted basis of recovery property the applicable percentage determined in accordance with the following table:
>
> *******************************
>
> (c) Recovery Property. –- For purposes of this title –-
>
> (1) Recovery Property Defined. –- Except as provided in subsection (e), the term "recovery property" means tangible property of a character subject to the allowance for depreciation –-
>
> (A) used in a trade or business, or
>
> (B) held for the production of income.

26 U.S.C. § 168. ACRS is mandatory and applied to "recovery property" placed in service after 1980 and before 1987.[3]

---

[3]In the Tax Reform Act of 1986, P. L. 99-514, § 201, Congress made substantial changes to I.R.C. § 168. In particular,

9

Section 168(c)(2) grouped recovery property into five assigned categories: 3-year property, 5-year property, 10-year property, 15-year real property and 15-year public utility property. Three year property was defined as § 1245 property[4] with a class life of 4 years or less. Five year property is all § 1245 property with a class life of more than 4 years. Ten year property is primarily certain public utility property, railroad tank cars, coal-utilization property and certain real property described in I.R.C. § 1250(c). Other long-lived public utility property is in the 15-year class. 26 U.S.C. § 168(a)(2)(A), (B) and (C). Basically, 3-year property includes certain short-lived assets such as automobiles and light-duty trucks, and 5-year property included all other tangible personal property that was not 3-year property. Most eligible personal property was in the 5-year class.

The Commissioner argues that ERTA § 168 did not eliminate the pre-ERTA § 167 requirement that tangible personalty used in a trade or business must also have a determinable useful life in order to qualify for the ACRS deduction. She argues that the phrase "of a character subject to the allowance for depreciation" demonstrates that the pre-ERTA § 167 requirement for a determinable useful life is the threshold criterion for claiming the § 168 ACRS deduction.

---

Congress deleted the "recovery property" concept from the statute.

[4] § 1245 property is, inter alia, any personal property which is or has been property of a character subject to allowance for depreciation provided in § 167. 26 U.S.C. § 1245(3).

10

Much of the difficulty inherent in this case arises from two related problems.  First, Congress left § 167 unmodified when it added § 168; second, § 168 contains no standards for determining when property is "of a character subject to the allowance for depreciation."  In the absence of any express standards, logic and common sense would dictate that the phrase must have a reference point to some other section of the Internal Revenue Code.  Section 167(a) would appear to be that section. As stated above, that section provides that "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear. . . of property used in a trade or business. . . ."  The Commissioner assumes that all of the depreciation regulations promulgated under § 167 must, of necessity, be imported into § 168.  That importation would include the necessity that a taxpayer demonstrate that the asset have a demonstrable useful life, and (the argument continues) satisfy the phrase "tangible property of a character subject to the allowance for depreciation" in § 168.

However, we do not believe that Congress intended the wholesale importation of § 167 rules and regulations into § 168. Such an interpretation would negate one of the major reasons for enacting the Accelerated Cost Recovery System.  Rather, we believe that the phrase "of a character subject to the allowance for depreciation" refers only to that portion of § 167(a) which allows a depreciation deduction for assets which are subject to exhaustion and wear and tear.  Clearly, property that is not subject to such exhaustion does not depreciate. Thus, we hold that "property of a character subject to the allowance for

11

depreciation" refers to property that is subject to exhaustion, wear and tear, and obsolescence. However, it does not follow that Congress intended to make the ACRS deduction subject to the § 167 useful life rules, and thereby breathe continued life into a regulatory scheme that was bewildering, and fraught with problems, and required "substantial restructuring."

We previously noted that Congress believed that prior depreciation rules and regulations did not provide the investment stimulus necessary for economic expansion. Further, Congress believed that the actual value of the depreciation deduction declined over the years because of inflationary pressures. In addition, Congress felt that prior depreciation rules governing the determination of useful lives were much too complex and caused unproductive disagreements between taxpayers and the Commissioner. Thus, Congress passed a statute which "de-emphasizes the concept of useful life." GENERAL EXPLANATION OF THE ECONOMIC RECOVERY TAX ACT OF 1981 at 1449. Accordingly, we decline the Commissioner's invitation to interpret § 168 in such a manner as to re-emphasize a concept which Congress has sought to "de-emphasize."

The Commissioner argues that de-emphasis of useful life is not synonymous with abrogation of useful life. As a general statement, that is true. However, the position of the Commissioner, if accepted, would reintroduce unproductive disputes over useful life between taxpayers and the Internal Revenue Service. Indeed, such is the plight of Mr. Liddle.

Congress de-emphasized the § 167 useful life rules by creating four short periods of time over which taxpayers can

12

depreciate tangible personalty used in their trade or business. These statutory "recovery periods. . .are generally unrelated to, but shorter than, prior law useful lives." GENERAL EXPLANATION OF THE ECONOMIC RECOVERY TAX ACT OF 1981 at 1450. The four recovery periods are, in effect, the statutorily mandated useful lives of tangible personalty used in a trade or business.

The recovery periods serve the primary purpose of ERTA. Once a taxpayer has recovered the cost of the tangible personalty used in a trade or business, i.e., once the taxpayer has written off the asset over the short recovery period, his or her basis in that asset will be zero and no further ACRS deduction will be allowed. To avail himself or herself of further ACRS deductions, the taxpayer will have to purchase a new asset. Thus, because the recovery period is generally shorter that the pre-ERTA useful live of the asset, the taxpayer's purchase of the new asset will increase capital formation and new investment and, as a result, promote the Congressional objective for continued economic expansion.

Thus, in order for the Liddles to claim an ACRS deduction, they must show that the bass is recovery property as defined in I.R.C. § 168(c)(1). It is not disputed that it is tangible personalty which was placed in service after 1980 and that it was used in Brian Liddle's trade or business. What is disputed is whether the bass is "property of a character subject to the allowance for depreciation." We hold that that phrase means that the Liddles must only show that the bass was subject to exhaustion and wear and tear. The Tax Court found as a fact that the instrument suffered wear and tear during the year in which

13

the deduction was claimed. 103 T.C. 285, 294 (1994). That finding was not clearly erroneous. Accordingly, the Liddles are entitled to claim the ACRS deduction for the tax year in question.

Similarly, we are not persuaded by the Commissioner's "work of art" theory, although there are similarities between Mr. Liddle's valuable bass, and a work of art. The bass, is highly prized by collectors; and, ironically, it actually increases in value with age much like a rare painting. Cases that addressed the availability for depreciation deductions under § 167 clearly establish that works of art and/or collectibles were not depreciable because they lacked a determinable useful life. See, Associated Obstetricians and Gynecologists, P.C. v. Commissioner, 762 F.2d 38 (6th Cir. 1985) (works of art displayed on wall in medical office not depreciable); Hawkins v. Commissioner, 713 F.2d 347 (8th Cir.) (art displayed in law office not depreciable); Harrah's Club v. United States, 661 F.2d 203 (Ct. Cl. 1981) (antique automobiles in museum not depreciable). See also, Rev. Rul. 68-232, 1968-1 C.B. 79 ("depreciation of works of art generally is not allowable" because '[a] valuable and treasured art piece does not have a determinable useful life.'").

We also realize that, in a similar case, a musical instrument was held to not qualify for depreciation. See Browning v. Commissioner, 890 F.2d 1084 (9th Cir. 1989). However, Browning was decided on the basis of § 167(a) and depreciation law as it existed before the enactment of ERTA and §168, and it therefore provides little guidance to our inquiry. In addition, the taxpayer in Browning failed to meet his burden that the

14

Stradivarius violins in question had only a useful life of 12 years under the ADR system then in effect. 890 F.2d at 1087. Moreover, it appears from the Tax Court opinion that the taxpayer may not have been using the instruments in his profession but rather was acquiring them as collectibles. 55 T.C.M.(CCH) 1232, 1237 (1988)(" [F]rom the record, we have no definite answer as to how often the three antique violins were used, if ever. . . . In fact, we suspect that petitioner was forming a collection of antique violins not only as musical tools of the trade but as antique collectibles.") In Brian Liddle's professional hands, his bass viol was a tool of his trade, not a work of art. It was as valuable as the sound it could produce, and not for its looks. Normal wear and tear from Liddle's professional demands took a toll upon the instrument's tonal quality and he, therefore, had every right to avail himself of the depreciation provisions of the Internal Revenue Code as provided by Congress.

15

**III.**

Accordingly, for the reasons set forth above, we will affirm the decision of the tax court.