T.C. Memo. 1999-77


UNITED STATES TAX COURT


LYKES ENERGY, INC. AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 7685-96; 4979-97.      Filed March 11, 1999.

S, a gas utility company, collected funds from its
customers which were earmarked for legislatively
mandated energy conservation programs.  The State
required S to account separately for the funds and
monitored program expenditures.  S could not retain the
unexpended amounts and was charged interest on the
funds that exceeded expenditures.  The largest
expenditure was subsidies paid to purchasers of gas
appliances from S.  S' sales, customer base, and rate
base increased as a result of the programs. <u>Held</u>: S'
gross income includes the funds. <u>Held</u>, <u>further</u>, S must
capitalize the expenditures, less the amount paid as
subsidies, which is currently deductible.

<u>Nathan B. Simpson</u> and <u>Matthew J. Foster</u>, for petitioners.

<u>William A. Goss</u> and <u>Benjamin A. DeLuna</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  This consolidated case was submitted to the Court without trial.  See Rule 122(a).  Lykes Energy, Inc. (Lykes) and Subsidiaries petitioned the Court to redetermine the following Federal income tax deficiencies:

| Taxable Year | Deficiency |
|--------------|------------|
| 1988 | $1,075,219 |
| 1989 | 1,023,665 |
| 1990 | 1,306,399 |
| 1991 | 1,524,819 |
| 1992 | 1,704,765 |
| 1993 | 1,904,928 |
| 1994 | 1,953,607 |

We must decide whether funds collected by Lykes' subsidiary, People's Gas System, Inc. (People's), under the terms of certain energy conservation programs (FEECA programs) are includable in People's gross income.  We hold they are.  We also must decide whether People's expenditures under the FEECA programs are required to be capitalized under section 263(a).[1]  We hold they are to the extent described herein.  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the subject years.  Rule references are to the Tax Court Rules of

---

[1] People's participated in seven FEECA programs.  Respondent has conceded that petitioners may deduct expenditures for two of these programs; namely, the Residential Conservation Service Program and the Appliance Energy Savings Payback Program.  The parties agree that any amounts required to be capitalized must be amortized over 13 years.

Practice and Procedure.  Dollar amounts are rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference.  Lykes is the parent corporation of an affiliated group of corporations that files consolidated Federal income tax returns based on a fiscal year ending on September 30.  Lykes was headquartered in Tampa, Florida, when the petitions were filed.

People's distributes natural gas in Florida.  It is a utility subject to regulation by the Florida Public Service Commission (PSC).  Pursuant to the Florida Energy Efficiency and Conservation Act (FEECA), the PSC required that People's design and administer the FEECA programs.  People's administers these programs subject to the PSC's supervision.  The FEECA programs are generally designed to reduce consumption of high cost petroleum and to lower electrical energy consumption.

For its 1988 through 1991 taxable years, People's included receipts from the FEECA programs (FEECA receipts) in its gross income, and it deducted its expenditures under the programs (FEECA expenditures).  Starting with its 1992 taxable year, People's excluded FEECA receipts from its gross income and did not deduct any FEECA expenditures.

People's undertook the following programs to comply with FEECA:

(1) SINGLE FAMILY RESIDENTIAL HOME BUILDER PROGRAM.--Under this program, which was designed to increase the number of gas customers in the new residential construction market, People's paid builders to install gas appliances in new residential developments.  For the respective taxable years in issue, expenditures for this program were $165,077, $155,636, $198,027, $232,213, $829,481, $1,915,006, and $2,824,892.

(2) RESIDENTIAL CONSERVATION SERVICE PROGRAM.-- Under this program, which was designed to help existing residential customers reduce energy consumption, People's paid contractors to perform energy efficiency audits and recommend energy saving steps.  Expenditures for this program were $20,131 in 1988 and $4,974 in 1989.

(3) REPLACEMENT OF OIL HEATING PROGRAM.--Under this program, which was targeted at customers mainly interested in converting oil heat to gas heat, People's paid for part of the cost of installing gas appliances. For the respective taxable years in issue, expenditures for this program were $179,788, $102,230, $81,036, $92,772, $72,360, $64,756, and $51,810.

(4) APPLIANCE ENERGY SAVINGS PAYBACK PROGRAM.-- Under this program, which was designed to encourage gas customers to replace existing gas appliances with new, more energy-efficient appliances, People's generally subsidized the purchase of new, more energy-efficient models.  For the respective taxable years in issue, expenditures for this program were $171,339, $152,505, $219,728, $160,032, $151,424, $387,110, and $386,070.

(5) COGENERATION PROMOTION AND FEASIBILITY AUDIT PROGRAM.--Under this program, which was designed to encourage industrial, commercial, and institutional users to generate electricity on-site using natural gas fired generators, People's provided free feasibility audits to customers considering installing cogeneration facilities.  Expenditures for this program totaled $118 in 1989 and $12,500 in 1992.

(6) APPLIANCE DEALER/CONTRACTOR PROGRAM.--Under this program, which was designed to encourage replacing electric or older gas appliances with new gas appliances, People's paid dealer/contractors and customers to install new gas appliances. In 1990, this program was discontinued. The expenditures listed below for the 1992, 1993, and 1994 taxable years relate to a "Gas Space Conditioning Allowance Program", which was designed to convert on-main customers from electric space conditioning equipment to gas space conditioning equipment. This latter program was targeted at existing gas consumers, offering an allowance to help defray the higher "first costs" of gas space conditioning equipment. For the respective taxable years in issue, expenditures for these programs were $84,120, $28,436, $16,630, $8,701, $52,000, $50,250, and $27,000.

(7) ELECTRIC RESISTANCE REPLACEMENT PROGRAM.-- Under this program, which was designed to encourage customers to replace electric appliances with gas appliances by subsidizing the installation of gas appliances, People's paid residential customers to switch to gas heat from electric heat. In 1990, this program was bifurcated into two programs, one for residential customers and the other for commercial users. For the respective taxable years in issue, these programs' expenditures were $2,170,942, $2,510,076, $3,091,036, $3,486,573, $3,364,740, $2,452,452, and $2,380,931.

The largest single category of FEECA expenditures consisted of subsidies for people who bought gas appliances from People's or an affiliate (collectively referred to as People's). The percentages of program expenditures that were subsidies were:[2]

| Taxable Year | Percentage |
|---|---|
| 1988 | 69 |
| 1989 | 79 |

[2] These percentages were stipulated by the parties as "minimum percentages". The record, however, does not allow us to find a greater percentage.

| | |
|------|----|
| 1990 | 83 |
| 1991 | 85 |
| 1992 | 76 |
| 1993 | 63 |
| 1994 | 62 |

Each FEECA program was initially designed by People's to meet goals established by the PSC. The PSC had the final say as to whether a particular program was approved and implemented. In deciding whether to approve a particular program, the PSC calculated the present dollar value of cost savings to be realized by the people of Florida. These cost savings related to factors such as reduced consumption of kilowatt hours of electric energy. Other benefits taken into account were the value of incentive payments paid to, or on behalf of, Florida public utility customers. The value of these benefits was then divided into the projected costs of the program. Under this formula, a proposed program had to have a cost effectiveness ratio greater than 1 to be approved. In deciding which of People's program proposals to approve, the PSC did not consider the benefit to People's.

Funds to pay for the FEECA programs were generated by building an extra factor into the rate People's charged most of its customers.[3] People's had to identify the portion of its

---

[3] Beginning in 1990, certain commercial and industrial customers who agreed to have their gas service interrupted when People's experienced unusually high demand did not have FEECA costs built into their rates.

receipts allocable to the FEECA programs on its books and records. People's was prohibited by the PSC from separately stating this portion on its customers' bills.

People's collected FEECA funds subject to a statutory obligation not to expend them for any purpose other than FEECA programs. It kept separate bookkeeping accounts to record FEECA receipts and FEECA expenditures, and, at fixed intervals of 6 months to a year, the PSC conducted in-depth audits of these accounts. If People's charged an expense that the PSC deemed improper, the charge was disallowed. These disallowances were not charged back to People's customers. They were borne by People's and its shareholders in the form of reduced net income. People's did not segregate the FEECA funds in separate bank accounts.

For each period, the FEECA rate factor was calculated as closely as possible to generate just enough receipts to cover the period's anticipated FEECA expenditures. If People's FEECA receipts exceeded a period's FEECA expenditures, the excess, plus interest on the excess, was subtracted from the amount the following period's rate factor was designed to yield.

If and when the FEECA programs terminate, or if and when People's goes out of business, any residual funds in the FEECA accounts must be refunded to the ratepayers. If People's is acquired by another company, the FEECA account balances pass to

the acquirer which must assume People's obligation to make FEECA expenditures.

The amounts billed to People's customers for the FEECA programs are not payments for the goods and services a customer consumes. In designing the rates that People's may charge its customers, the PSC does not consider FEECA receipts as part of People's revenue from goods and services. It does not consider FEECA expenses as part of People's "prudently incurred" expenses of providing goods and services. It does not include excess FEECA receipts as part of People's capital investment on which it is entitled to earn a return.

The State of Florida and its citizens are the intended beneficiaries of the FEECA statute and the FEECA programs. No direct benefit to People's is intended. People's customer base, rate base, and natural gas sales have increased as a result of FEECA expenditures.

OPINION

Petitioners, relying on Seven-Up Co. v. Commissioner, 14 T.C. 965 (1950), and its progeny, contend that the FEECA receipts are excludable from People's gross income. Petitioners argue that People's was a conduit for the receipts in that it received them subject to an obligation to account for them separately and to expend them for a set purpose under the control and supervision of the PSC. Petitioners contend that People's

realized no gain or profit when it collected the funds. Respondent argues that the FEECA receipts are includable in People's gross income. Respondent contends that People's collected the receipts without a trust relationship. Respondent contends that the FEECA expenditures benefited People's significantly.

We agree with respondent that the FEECA receipts are includable in People's gross income. We begin our analysis with the statutory text, which provides that "gross income means all income from whatever source derived". Sec. 61(a). Congress prescribed this text intending to "use the full measure of its taxing power". Helvering v. Clifford, 309 U.S. 331, 334 (1940). This text is construed broadly to reach any accession to wealth realized by a taxpayer, and over which the taxpayer has complete control. See United States v. Burke, 504 U.S. 229 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

Funds received by a taxpayer are excludable from gross income when: (1) The funds are received in trust subject to a restriction that they be expended for a specific purpose and (2) the taxpayer does not profit, gain, or benefit in spending the funds for the stated purpose. See Ford Dealers Adver. Fund, Inc. v. Commissioner, 55 T.C. 761, 771-772 (1971) (discussing Seven-Up Co. v. Commissioner, supra, and its progeny), affd. per curiam 456 F.2d 255 (5th Cir. 1972). People's does not meet this

test.  It did not receive the FEECA receipts in trust.  A trust requires that (1) a person (2) take title to property (3) pursuant to an explicit directive (4) to preserve or protect the property. See Johnson v. Commissioner, 108 T.C. 448, 476 (1997); sec. 301.7701-4(a), Proced. & Admin. Regs.  Here, the purported settlors, namely People's customers, never intended to create a trust or even knew they were funding the FEECA programs. People's received the FEECA receipts from its customers as payments for gas, and the customers, at the time of payment, did not know that any part of the payments was for other than their gas use.  In fact, PSC rules explicitly barred People's from telling its customers that a portion of each payment was funding the FEECA programs.

Nor did People's satisfy the second prong of the Seven-Up test, which requires that it expend the funds without profit, gain, or benefit.  The subsidies paid by People's benefited it significantly in that they encouraged utility users to purchase gas appliances from People's.  The effect of the FEECA programs was that they served to shift the cost of these subsidies from People's to its rateholders.  The FEECA programs also increased People's rate base, number of customers, and sales.

We turn to the second issue; namely, whether People's must capitalize the FEECA expenditures.  Respondent answers this question in the affirmative as to all the disputed expenditures.

Respondent contends that the disputed expenditures are capitalizable because they produced new customers for People's. Petitioners argue that the expenditures are deductible. Petitioners contend that most of the expenditures relate to sales of appliances. Petitioners contend that the other expenditures yielded no significant future benefit.

Agreeing with respondent in part and with petitioners in part, we hold that some of the FEECA expenditures are deductible while others must be capitalized. Section 162(a) provides a deduction for an accrual method taxpayer like People's only when an expenditure is: (1) An expense, (2) an ordinary expense, (3) a necessary expense, (4) incurred during the taxable year, and (5) made to carry on a trade or business. See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971). An expense that creates a separate and distinct asset is not "ordinary". Id. at 354; see also Norwest Corp. & Subs. v. Commissioner, 112 T.C. ___ (1999), and the cases cited therein. Nor is an expense "ordinary" when it generates a significant long-term benefit that extends beyond the end of the taxable year. See INDOPCO v. Commissioner, 503 U.S. 79, 87-88 (1992); Norwest Corp. & Subs. v. Commissioner, supra. Recognizing income concomitantly with the recognition of the related expenses is a goal of our income tax system, and a proper matching is achieved when an expense is deducted in the taxable year or years in which

the related income is recognized.  See <u>Newark Morning Ledger Co.</u> <u>v. United States</u>, 507 U.S. 546, 565 (1993); <u>INDOPCO, Inc. v.</u> <u>Commissioner</u>, <u>supra</u> at 84; <u>Hertz Corp. v. United States</u>, 364 U.S. 122, 126 (1960); <u>Liddle v. Commissioner</u>, 103 T.C. 285, 289 (1994), affd. 65 F.3d 329 (3d Cir. 1995); <u>Simon v. Commissioner</u>, 103 T.C. 247, 253 (1994), affd. 68 F.3d 41 (2d Cir. 1995).

Our resolution of this issue turns on whether the FEECA expenses were "ordinary".  The subsidies were.  People's benefited from them currently in that they induced customers to purchase products from People's.  Of course, People's sales may yield future benefits, such as repeat business and sales of related products or commodities.  Those future benefits, however, are incidental to the sales at hand.

We considered a similar issue in <u>Fall River Gas Appliance</u> <u>Co. v. Commissioner</u>, 42 T.C. 850 (1964), affd. 349 F.2d 515 (1st Cir. 1965).  There, the taxpayers were a gas company and its subsidiary; the subsidiary sold and leased gas appliances.  We held that the selling expenses related to the leased appliances must be capitalized.  We held that the selling expenses related to the appliance sales were deductible.  As to the latter class, we noted that the expenses "were related to closed transactions and were a proper charge at once against the income realized from such transactions." <u>Id.</u> at 856.  The same rationale applies here to the subsidies.  People's paid the subsidies to purchasers of

its products, and, in this setting, the subsidies relate primarily to the income from that sale as opposed to income that is intended to be generated in the future.  People's may deduct the subsidies as an ordinary expense of its business.

As to the remaining expenditures, those amounts are promotional or selling expenses unrelated to a specific sale. Given our finding that these expenditures primarily helped People's increase its customer base, we now decide whether gaining new customers yielded a future benefit to People's that was more than incidental.  We conclude it did.  While People's made substantial investments to induce its customers to use natural gas, its customers also made substantial investments to become gas customers.  That is the point of many of the FEECA programs.  New gas customers must generally buy new appliances. Often they have to install gas piping within the walls of their homes or commercial structures.  As a result, both People's and its new customers have a strong incentive to continue their business relationships beyond the initial years.  These upfront costs tend to discourage People's new customers from switching to other energy sources and essentially assure People's that it will receive revenue from these customers in the future.  This projected revenue stream, which is the direct object of People's promotional expenditures, is a significant future benefit.  The expenditures connected thereto must be capitalized.  See Houston

Natural Gas Corp. v. Commissioner, 90 F.2d 814, 817 (4th Cir. 1937), affg. 34 B.T.A. 228 (1936), wherein the appellate court stated that "an intensive campaign to get new customers at any time gives rise to capital expenditures, and the time when such expenditures might be incurred is not confined to the early or formative stages of a company".

We have considered all arguments by the parties, and, to the extent not discussed above, find them to be irrelevant or without merit.  To reflect the foregoing,

Decisions will be entered

under Rule 155.