T.C. Memo. 2011-14

UNITED STATES TAX COURT

DARRELL ROONEY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13430-07.                    Filed January 18, 2011.

<u>Brent E. Vallens</u>, for petitioner.

<u>Scott B. Burkholder</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined a $6,460[1] deficiency
in petitioner's 2003 Federal income tax.  Petitioner timely filed
a petition contesting respondent's determination.  After

_____

[1]Monetary amounts are rounded to the nearest dollar.

concessions[2] the issues for decision are: (1) Whether respondent is precluded from disallowing petitioner's Schedule C amortization[3] expense deduction for 2003 because he allowed a similar deduction during an audit of petitioner's 1999 Form 1040, U.S. Individual Income Tax Return; and (2) whether petitioner is entitled to the Schedule C amortization expense deduction he

_____

[2]On brief respondent concedes that on the 2003 Schedule C, Profit or Loss From Business, petitioner is entitled to deduct depreciation of $2,618 with respect to assets petitioner acquired in 1998 and 1999 and to deduct legal and professional fees of $1,091. Although the parties included the depreciation of archival photos and equipment of $412 and $22, respectively, in the description of the disputed expense deductions contained in stipulation 10 of the stipulation of facts, respondent states on brief and the record establishes that petitioner deducted those amounts as part of another category on his 2003 Schedule C, which respondent allowed. Accordingly, we disregard stipulation 10 to the extent described herein as inconsistent with the record. As follows from the foregoing, only the cost recovery of assets that petitioner acquired in 2000-2003 and included in calculating the disputed deduction claimed on his Schedule C remains at issue.

[3]Generally, depreciation is a reasonable allowance for exhaustion, wear and tear, and obsolescence, sec. 167(a), I.R.C., and refers to the gradual reduction in the value of tangible property, as opposed to intangible property, see Black's Law Dictionary 93, 473 (8th ed. 1999). With respect to intangible assets, the Internal Revenue Code generally uses the word "amortization". See, e.g., sec. 197, I.R.C. Petitioner claimed depreciation and amortization expenses in two categories on his 2003 Schedule C: (1) The depreciation and sec. 179, I.R.C., expense deduction category, and (2) the amortization expense deduction category. Only the latter category is at issue. For simplicity, we shall hereinafter refer to the disputed category as the cost recovery deduction.

claimed for 2003 under section 167(a)[4] or any other cost recovery section of the Code.

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference.  Petitioner resided in California when he filed his petition.

## I.   Petitioner's Professional Background

Petitioner is a film director, animator, writer, and producer who was employed during 2003 by Walt Disney Pictures & Television (Walt Disney).  Petitioner studied animation, film, and illustration in college and graduated with high honors.  In the 1980s petitioner took classes on directing, editing, acting, writing, and screenwriting.  During his studies petitioner learned about the importance of a clippings file, or research library,[5] which is a collection of photographs and illustrations, from magazines and books, of various images such as cars, weather, animals, or people.  Petitioner uses his research library as a tool when designing scenes.

Since 1980 petitioner has been involved in the production of animated TV series episodes and films for Walt Disney, Turner

---

[4]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[5]In addition to the term "research library", the parties also sometimes use "reference library".

Feature Animation, and Universal Pictures.  Petitioner has worked on such projects in various capacities, including writer, editor, layout artist, animator, storyboard artist, head of storyboards, sequence director, producer, and director.  In the 1990s petitioner started writing screenplays, some of which he sold. In the mid-1990s Walt Disney hired petitioner; petitioner's directing credits for Walt Disney include the animated films "Mulan 2" (2004), "Lady and the Tramp II:  Scamp's Adventure" (2001), "The Three Little Pigs" (1999), and "The Lion King II: Simba's Pride" (1998).

In addition to his employment with Walt Disney, petitioner has worked on several independent projects over the years. Petitioner has pitched some of the projects to studio executives or production companies, and some pitches resulted in sales in years before 2003.  If a pitch did not result in a sale, petitioner did not abandon the project; instead, he might pitch it again when meeting a new producer or development executive. Petitioner's goal is to make himself a more valuable and marketable director and to transition from directing animated films to directing live action feature films.

II.  Petitioner's Independent Projects and the Research Library

In 2003 petitioner had several open projects, many of which he has been trying to market since the 1990s.  The projects are described below.[6]

A.  Jean Harlow

In 2003 petitioner's principal independent project involved Jean Harlow (Ms. Harlow), a movie star of the 1930s, who died in 1937 at the age of 26.  Petitioner has been fascinated with Ms. Harlow since the 1970s.  When petitioner started writing a screenplay about Ms. Harlow in the early 1990s,[7] he realized that he lacked necessary information; and he started to expand his research library on Ms. Harlow, which was limited at that time to inexpensive reprint photos.

As of the trial date petitioner's research library on Ms. Harlow contained more than 65 three-ring binders of printed materials.  The binders are organized chronologically.  Most of the materials in the binders are from 1933 through 1936 because those were pivotal years in Ms. Harlow's life.  The binders

---

[6]In addition to the projects described in this section, in 2003 petitioner started work on the Fish Out of the Water and Vikings projects.  Although petitioner bought books for these projects in 2003, the record reflects that he did not claim deductions for the cost of the books on his 2003 Schedule C. Accordingly, we do not discuss these projects and petitioner's purchases related to them.

[7]The record does not establish that petitioner ever finished the Harlow screenplay.

contain articles from newspapers and movie magazines, books, loose pages from books, and magazine covers.

Petitioner's research library also contains 25 binders of photographs of Ms. Harlow and other materials, including letters, historical documents, contracts, personal mementos, contact information of fellow researchers and professional associations relating to Ms. Harlow, films, and vintage radio recordings on tape and CD and in transcript form. The photographs vary in quality and include reprints, copies of photographs, nonprofessional candid photographs, archival and autographed photographs, and production stills. Petitioner keeps his binder materials in archival plastic sleeves.

Petitioner purchased most of the materials on Ms. Harlow either at movie memorabilia shows or on eBay. Petitioner looks for materials that were written about her while she was alive and that were not changed by studio press or magazine editors.

Petitioner considers his collection an "encyclopedia" of Ms. Harlow's life. Petitioner intends to continue acquiring historical material, photos, letters, and other items that illuminate Ms. Harlow's private life. His goal is to collect a research library that is so extensive that he is the first person

contacted regarding the availability of items related to Ms. Harlow.[8]

In 1992 petitioner met Mark Vieira (Mr. Vieira), a photographer and writer, who, as of the trial date, had written and published seven books on Hollywood history. Mr. Vieira worked with petitioner in various ways in the process of writing three of the books. Mr. Vieira obtained materials on Hollywood history from petitioner, such as photographs or quotations about the subjects in the books, and petitioner was credited in the books. Before 2003 Mr. Vieira also used two photographs from petitioner's research library for one of his books for which he paid petitioner approximately $80.[9]

In late 2002 Mr. Vieira asked petitioner whether he would be interested in collaborating on a book about Ms. Harlow, and Mr. Vieira and petitioner prepared a proposal for a publisher. In May 2003 Mr. Vieira met with the publisher's marketing personnel, but the publisher was not interested.[10]

---

[8]Petitioner also claims he intends to write a screenplay and a book and create a film about Ms. Harlow. As of the trial date, he had not done any of these things.

[9]After Mr. Vieira rents photographs for use in his books, generally he is not obligated to pay a royalty when the book is published.

[10]Since then petitioner has expanded his research library to include rare photographs of Ms. Harlow from a sitting in Griffith
                                                    (continued...)

B.  <u>Titanic Survivors</u>

In the late 1980s and 1990s petitioner met 11 survivors of the sinking of the Titanic, several descendants of survivors, and one Titanic cross-channel passenger, and he interviewed them on film.  Petitioner testified that in the 1990s subsidiaries of Twentieth Century Fox and several other production companies licensed some part of the footage.  In the mid-1990s petitioner also sold some Titanic travelogue documentaries.[11]  Petitioner's research library concerning the Titanic contains photographs of the people he interviewed and footage of the interviews.  It also contains materials from magazines and books relating to the Titanic, its passengers and crew, and interview materials.

C.  <u>Cass Elliot</u>

In 1994 petitioner started his Cass Elliot project, which contemplates the development of a full-length musical feature film based on the life of singer Cass Elliot of the Mamas & the Papas, a popular musical group of the mid-1960s.  Petitioner interviewed people who knew Cass Elliot, and he collected materials on her, including books, magazines, and audio

_____

[10](...continued)
Park.  However, the record is not clear whether petitioner acquired these photographs in 2003 or later.

[11]With the centennial of the sinking of the Titanic coming up in 2012, petitioner hopes to repackage and sell the documentary footage.

materials.  Petitioner also had occasional meetings with writers or producers on this project in years before 2003.

    D.  Calamity Jane

The Calamity Jane project, which petitioner began in 1995, contemplates the creation of an animated musical film about Calamity Jane.  Petitioner pitched the project to a studio sometime before 2000, but the studio later abandoned the project and he resumed developing his original idea.  In 2000 petitioner pitched the project to two additional studios without success. Petitioner acquired materials for the project, including DVDs, VHS tapes, books, magazines, and photographs of Calamity Jane, her contemporaries, and the wild west of the 19th century.

    E.  Joan of Arc

In 1997 petitioner began his Joan of Arc project, which he envisions making into an animated, full-length production. Petitioner's research library on Joan of Arc contains books, films, photographs, and illustrations.  In 2000 petitioner unsuccessfully pitched the project to Walt Disney Television Animation.

    F.  The Black Donnellys

In 1998 petitioner began the Black Donnellys project, which envisions the development of a full-length feature film.  The project focuses on an infamous family of Irish immigrants who moved to Southern Ontario, Canada, in the early to mid 19th

century.  Petitioner acquired books, photographs, magazine articles, and other materials related to the project and visited London, Ontario, where the Black Donnellys lived.  In 2001 petitioner unsuccessfully pitched the project to Walt Disney Pictures.

III. Audit of Petitioner's 1999 Return

In 2001 respondent began examining petitioner's 1999 return (1999 audit).  On his 1999 Schedule C petitioner deducted depreciation and amortization expenses of $3,745.  In the course of the 1999 audit, respondent accepted petitioner's Schedule C depreciation and amortization deduction as reported.

IV.  Petitioner's 2003 Return

Petitioner's accountant, Judy Vargas (Ms. Vargas), prepared his 2003 return, and petitioner timely filed it.  Petitioner reported $308,373 in wages for his work as a director for Walt Disney.  Petitioner attached to his 2003 return a Schedule C on which he described his principal business as that of a producer and filmmaker.  The Schedule C reported no income or gross profit and a $20,843 loss.  As part of the Schedule C expenses, petitioner deducted $17,556 as the cost recovery deduction.  See supra note 3.  Petitioner depreciated or amortized most assets on a straight-line, 5-year basis.[12]

_____

[12]The record indicates that of the categories remaining at issue, petitioner amortized "Promotion" as a 5-year property
(continued...)

Of the $17,556 cost recovery deduction reported on petitioner's Schedule C that respondent disallowed, the following components remain at issue:

| Description | Year acquired | Cost basis | 2003 Deduction |
|---|---|---|---|
| Furniture/fixtures | 2000 | $10,558 | $2,112 |
| Goodwill/promotion | 2000 | 6,877 | 1,375 |
| Artist supply | 2000 | 1,098 | 220 |
| Research/tapes/theater | 2000 | 938 | 188 |
| Goodwill | 2001 | 2,091 | 418 |
| Dues and periodicals | 2001 | 2,511 | 352 |
| Books | 2001 | 4,202 | 588 |
| Promotion | 2001 | 2,991 | 477 |
| Salary promotion | 2001 | 6,934 | 1,387 |
| Animation art | 2001 | 1,838 | 257 |
| Photos | 2001 | 1,448 | 203 |
| Research library | 2002 | 5,145 | 1,029 |
| Research photo | 2002 | 19,808 | 3,962 |
| Promotion/goodwill | 2002 | 411 | 82 |
| Goodwill | 2002 | 3,029 | 606 |
| Reference library | 2002 | 6,554 | 1,311 |
| Reference library | 2003 | 16,781 | 280 |
| Vint. magazine/library | 2003 | 5,467 | 91 |
| Total | | 98,681 | 14,938 |

Because petitioner recovered the cost of most of the assets using a 5-year cost recovery period, his 2003 depreciation schedule included several assets that petitioner had acquired in 1998 and 1999 but had not fully depreciated or amortized. The 2003 depreciation schedule also included categories of assets purchased after 1999, which are similar to the categories on the 1999 depreciation schedule, such as research photos and library

---

[12](...continued)
using the 200-percent declining balance, mid-quarter convention method.

research acquired in 2002 and promotion/goodwill expenditures in 2000 and 2002.

Respondent audited petitioner's 2003 return and issued a notice of deficiency that disallowed in full the $17,556 cost recovery deduction and made certain computational adjustments. In the Form 886-A, Explanation of Items, attached to the notice of deficiency, respondent stated that the deduction is disallowed because "This item is not an allowable deduction."

OPINION

I.  Burden of Proof

The Commissioner's determinations are presumed correct, and the taxpayer ordinarily bears the burden of proving a determination is erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any claimed deduction.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Petitioner does not contend that section 7491(a) shifts the burden of proof to respondent, and the record does not permit us to conclude that the requirements of section 7491(a) are met.  Accordingly, petitioner bears the burden of proving that he is entitled to the claimed deduction.

II.  The Parties' Arguments

   A.   Respondent

Respondent does not argue that petitioner was not in the trade or business of being a producer and filmmaker, nor does respondent contest that petitioner actually spent the amounts he claimed to have spent.  Respondent contends instead that (1) petitioner's expenditures, at least those related to the Ms. Harlow project, were personal because the expenditures were to enhance petitioner's personal collection rather than to carry on his business as a producer and filmmaker, (2) even if the relevant expenses were business expenses, the amounts spent on items related to Ms. Harlow were not reasonable, and (3) even if we were to conclude that depreciating the assets was proper, petitioner incurred the costs in the process of creating long-lived assets (the created assets) and he should have capitalized the expenses under section 263A, which permits a taxpayer to recover costs only when the taxpayer places the created assets in service.

Respondent's section 263A argument was raised for the first time in his opening brief.  Petitioner anticipated the argument because he refers to it in his opening brief,[13] filed

_____

[13]In his opening brief petitioner lists but does not address other issues such as whether the expenses were reasonable and necessary, whether the expenses are subject to the hobby loss rules of sec. 183, and whether petitioner may deduct expenses

                                        (continued...)

concurrently with respondent's, and does not assert that the argument is a new matter that either shifts the burden of proof to respondent or precludes our consideration of the argument. However, we do not need to consider respondent's section 263A argument because we deny petitioner's cost recovery deductions on other grounds.

B.  Petitioner

Petitioner's posttrial briefs focus primarily on one issue --the effect of the 1999 audit on respondent's adjustments to petitioner's Schedule C cost recovery deductions.  Petitioner's principal argument in his opening brief is that the 1999 audit resulted in an agreement on which petitioner is entitled to rely in subsequent years.  Even in his reply brief petitioner focuses solely on the effect of the 1999 audit.[14]  As a result petitioner's opening and reply briefs are not particularly helpful in deciding the issues.

---

[13](...continued)
with respect to creative projects "which are under development, but which have not yet been produced and sold".

[14]Petitioner also asserts that the legal issues during trial were different from the issues that were in dispute during the 2003 audit.  According to petitioner, during the audit and at the Appeals level respondent argued that the assets should be depreciated on a 15-year basis with a midyear convention. Petitioner also alleges that, after the case was docketed, respondent changed course and claimed that petitioner incurred the expenses in pursuit of a hobby.  Petitioner, however, does not allege any prejudice or unfair surprise, and we conclude there is none.  Respondent confirmed during trial and in his reply brief that sec. 183 is not at issue.

In his opening brief petitioner states that he was prepared to present evidence regarding whether the expenditures were "ordinary and necessary"[15] but abbreviated his presentation in response to comments by the Court during the trial. While petitioner's point is not entirely clear, he appears to imply that he was misled by the Court into abbreviating his case at trial. He is mistaken. We warned petitioner on more than one occasion during trial that he had the burden of proof and that he needed to introduce evidence to show that the requirements for claiming cost recovery deductions for the items in question were satisfied. For the most part, petitioner did not come to trial with the evidence he needed to support the disputed deduction. Moreover, petitioner had ample opportunity to address respondent's arguments in his posttrial briefs but made a deliberate decision not to do so, relying instead on the 1999 audit. Having decided how to try his case and prepare his posttrial briefs, petitioner must live with the consequences of his decisions and cannot now complain that any failure of proof rests on anyone's shoulders but his own.

---

[15]In his pretrial memorandum respondent relies on sec. 162 and argues that petitioner failed to show that the research library expenses were ordinary, necessary, and reasonable. However, respondent does not explain how sec. 162 is relevant to deductions under the cost recovery sections of the Code. Cf. Noyce v. Commissioner, 97 T.C. 670, 688-689 (1991) (distinguishing sec. 168, the authority for deducting an allowance for depreciation in that case, from sec. 162).

III. The Effect of the 1999 Audit

Petitioner contends that on his 1999 Schedule C he depreciated assets similar to those on the 2003 Schedule C and that respondent considered the issue during the 1999 audit and allowed the deductions. Petitioner suggests that at the conclusion of the 1999 audit he and respondent entered into a settlement agreement pursuant to which he would depreciate the assets on a 5-year straight-line basis and that he relied on the settlement agreement in computing his 2003 Federal income tax liability. Petitioner contends that respondent may not repudiate the settlement agreement and is barred from disallowing the depreciation deductions with respect to the similar categories of assets. We disagree.

The record does not support a finding that the parties entered into a settlement agreement with respect to the 1999 audit. The record simply reflects that the 1999 audit was closed without change.[16] Moreover, the result of a prior audit ordinarily does not bind the Commissioner because each tax year is to be considered separately. United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969). Although reliance on a prior audit may establish reasonable cause and good faith, see sec. 6664(c), for the purpose of determining whether the section 6662 accuracy-

---

[16]The record contains respondent's Letter 1156 to petitioner dated Aug. 6, 2002, showing no adjustments to the 1999 Schedule C and no deficiency for 1999.

related penalty applies, see, e.g., <u>De Boer v. Commissioner</u>, T.C. Memo. 1996-174, the Commissioner's failure to challenge a position in a prior audit does not bar a subsequent challenge with respect to a similar position, see <u>Rose v. Commissioner</u>, 55 T.C. 28, 32 (1970); <u>Tesar v. Commissioner</u>, T.C. Memo. 1997-207. Accordingly, we hold respondent is not estopped from disallowing the disputed cost recovery deduction in 2003 for expenses similar to those that he had allowed in the 1999 audit.[17]

IV.  <u>Petitioner's Evidence at Trial</u>

The record contains Exhibit 34-J, which consists of summaries of receipts for items petitioner purchased in 2003. Petitioner coded most items to show whether the purchase related to a specific project or was "General ongoing research". Petitioner explained that Exhibit 34-J was the cover sheet from his box of records for 2003, and the box itself contained receipts and a detailed description of each item.  Although petitioner claims that the boxes of receipts for the 2000-2002 purchases had similar cover sheets, he did not introduce either the summaries or the original receipts into evidence at trial, nor did he bring the summaries or receipts to trial.

---

[17]Respondent conceded depreciation deductions with respect to assets purchased in 1998 and 1999 that were examined during the 1999 audit and for which petitioner claimed a depreciation deduction in 2003.  See <u>supra</u> note 2.

Petitioner asserts on brief that before trial his counsel proposed that the boxes of receipts for 1998-2003 be offered as evidence at trial. According to petitioner, respondent's counsel said that the introduction of those boxes of receipts was "unnecessary and inappropriate because the documentation of the expenditures was not an issue in dispute in the case." Petitioner claims that, on the basis of this representation, he did not offer as evidence the boxes of receipts for 2000-2002, he brought to trial only the box of receipts for 2003, and he introduced in evidence only the cover sheet from the 2003 box of receipts. Respondent denies that he prevented petitioner in any way from introducing evidence.

At no point during trial did petitioner assert that respondent misled him in any way with respect to the records for 2000-2002, even when we expressed concern that petitioner was not proving how his purchases were connected to his Schedule C activity. For example, during trial we stated that petitioner's depreciation schedule reflects categories and that petitioner was not explaining "what actually * * * [was] in each one of these categories". During Ms. Vargas' testimony, we expressed concerns about the lack of testimony on how the assets related to petitioner's Schedule C activity. At the conclusion of the trial we again stated that the record contained no detail regarding petitioner's purchases with the exception of purchases made

during 2003. At no point after we gave these warnings did petitioner's counsel explain why he did not bring the documents to trial or why he did not attempt to introduce them into evidence, nor did he ask us to keep the record open to submit them.

Petitioner also states that during trial his counsel realized that the issues being considered by the Court were not the same as the issues raised by the parties. Petitioner claims his counsel abbreviated his presentation of evidence on the issue of whether the expenditures were "ordinary and necessary" and switched to presenting evidence on the effect of the 1999 audit. The effect of the 1999 audit was one of the issues in this case, and our questioning the parties regarding one issue does not render other arguments of the parties moot or irrelevant. Moreover, because we repeatedly called petitioner's counsel's attention to the kind of evidence that would be helpful in deciding whether petitioner was entitled to the cost recovery deductions he claimed, petitioner's posttrial argument regarding abbreviating his presentation of evidence at trial lacks merit.

V.   Petitioner's Cost Recovery Deduction

     A.   Cost Recovery in General

Although petitioner characterized the disputed cost recovery deduction as an amortization deduction, the parties seem to agree

that petitioner claimed it under section 167.[18]  Section 167(a) allows as a depreciation deduction a reasonable allowance for exhaustion, wear and tear, and obsolescence of property if the taxpayer uses such property in a trade or business or other income-producing activity.  See also sec. 1.167(a)-1(a), Income Tax Regs.  Section 168 provides that except as otherwise provided therein, the depreciation deduction authorized by section 167(a) for any tangible property shall be determined by using (1) the applicable depreciation method, (2) the applicable recovery period, and (3) the applicable convention.  The depreciation system set forth in section 168 as in effect for 2003 is known as the modified accelerated cost recovery system (MACRS).

Depreciation is an accounting device that recognizes that the physical consumption of a capital asset in a business activity is a true cost of doing business, since the asset is being depleted.  Commissioner v. Idaho Power Co., 418 U.S. 1, 10 (1974).  A depreciation deduction allows a taxpayer to recover his investment in an income-producing asset over the useful life of the asset.  Liddle v. Commissioner, 103 T.C. 285, 289 (1994), affd. 65 F.3d 329 (3d Cir. 1995).  As the process of consumption

---

[18]Sec. 1.162-6, Income Tax Regs., allows a taxpayer to claim as deductions the cost of supplies used by him in the practice of his profession, including amounts paid for books and furniture with short useful life.  Petitioner does not claim deductions under sec. 1.162-6, Income Tax Regs., nor does the record permit us to conclude that any of contested expenses qualified for a deduction under sec. 162.

continues, and depreciation is claimed and allowed, the asset's adjusted basis is reduced to reflect the distribution of its cost over time. Commissioner v. Idaho Power Co., supra at 10. "'[The] purpose of depreciation accounting is to allocate the expense of using an asset to the various periods which are benefited by that asset.'" Id. at 10-11 (quoting Hertz Corp. v. United States, 364 U.S. 122, 126 (1960)).

Under the cost recovery provisions of the Code, which have changed considerably over time and are quite complex, a taxpayer may under certain circumstances depreciate or amortize an asset used in the active conduct of a trade or business. The circumstances vary depending on, among other things, the type of property involved and the date on which the property is placed in service. Different types of property are subject to different sets of rules, and there are several systems of cost recovery that may apply, e.g., the Accelerated Cost Recovery System (ACRS) (generally in effect for property placed in service during 1981-1986), MACRS (generally effective for property placed in service beginning after 1986), and section 167.[19] Assuming for the

---

[19]The rules with respect to the amortization of certain kinds of intangible property are set forth in sec. 197 and in other provisions of the Code. See, e.g., sec. 169 (pollution control facilities). Neither party contends that the expenditures in question were sec. 197 intangibles or that other amortization provisions apply.

moment that section 263[20] and section 263A,[21] which postpone cost recovery under certain circumstances, do not apply, any analysis of the propriety of a cost recovery deduction must take into account the type of property for which a taxpayer is claiming a cost recovery allowance deduction and whether the property is subject to wear and tear, decay or decline from natural causes, exhaustion, and/or obsolescence during the time that the property is used in the taxpayer's business.  See, e.g., secs. 167, 168, 197 (and related regulations).  If property is not subject to wear and tear, to decay or decline from natural causes, to exhaustion, and/or to obsolescence, no allowance for depreciation is deductible.  Sec. 1.167(a)-2, Income Tax Regs.  The regulations under section 167 provide that personal property is depreciable under section 167 if the taxpayer established the useful life of the property.  See sec. 1.167(a)-1(a) and (b), Income Tax Regs.  No depreciation under section 167 is allowed with respect to museum pieces of indeterminable useful life.  See Harrah's Club v. United States, 228 Ct. Cl. 650, 661 F.2d 203

---

[20]Sec. 263(a) provides that no deduction shall be allowed for any amount (1) "paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate" or (2) "expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made."

[21]Sec. 263A provides for the capitalization of certain costs of property produced by the taxpayer.  See sec. 263A(a)(1)(B), (2), (b).

(1981).  We have held that a painting displayed for business purposes that suffers no wear and tear is not depreciable under ACRS when the taxpayer failed to prove a determinable useful life.  See Clinger v. Commissioner, T.C. Memo. 1990-459.  Under ACRS, however, once the taxpayer establishes that an asset is subject to exhaustion, wear and tear, or obsolescence, the taxpayer does not need to show the useful life of the asset. Liddle v. Commissioner, supra at 296-297; Selig v. Commissioner, T.C. Memo. 1995-519.

Even if property might otherwise be subject to the cost recovery provisions because the property is adversely affected by use or by the passage of time, generally no deduction for personal, living, or family expenses is allowed, sec. 262(a), and no depreciation deduction is allowed for personal use property, cf. sec. 1.167(a)-1(a), Income Tax Regs.  Moreover, under section 274(a)(1)(A) no deduction otherwise allowable is permitted for any entertainment item "With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation" unless the taxpayer establishes that the item was directly related to the active conduct of the taxpayer's trade or business.

The taxpayer claiming a cost recovery deduction such as depreciation or amortization ordinarily has the burden of proving that the expenditure is depreciable and/or is not a personal

expense and that the requirements of the applicable cost recovery system have been met.  See Rule 142(a).  For the reasons set forth below, petitioner has failed to carry his burden of proof.

B.    Whether Petitioner's Assets Were Depreciable or Personal[22]

1.    Expenditures With Respect to Assets Purchased in 2003

Petitioner's depreciation schedule indicates that in 2003 petitioner acquired two categories of assets that were included in calculating the disputed cost recovery deduction:  Reference library and vintage magazine-library materials.  The reference library items were archival photographs of Jean Harlow that petitioner purchased in 2003.  The vintage magazine-library materials[23] consisted of (1) over 200 vintage magazines related to Ms. Harlow, (2) items designated as "General ongoing research", which included a photo, magazines, and newspapers, and (3) several uncategorized items.

The items included in the categories described above can fairly be divided into Harlow items and non-Harlow items.  The

_____

[22]Respondent's brief is unclear as to whether respondent contends that all of petitioner's expenditures, including those not related to the Harlow project, were personal.  We address other expenses because respondent did not concede the depreciation amount with respect to other assets, except as discussed supra note 2.

[23]We understand that the "Vint. magazine-library" category of the depreciation schedule correlates with the "Dues and periodicals" category of Exhibit 34-J.

Harlow items include the archival photographs of Ms. Harlow and the vintage magazines containing Harlow material.[24]  The non-Harlow items consist of other items purchased in 2003 that were unrelated to Ms. Harlow and were included in the calculation of the disputed deduction.

Respondent argues that the Harlow items were part of an extensive collection of Harlow-related items that petitioner should not be permitted to depreciate.  Respondent argues that the items in question have an indefinite economic life and are not properly subject to a cost recovery allowance.

Petitioner wanted to build a research library on Ms. Harlow that is so comprehensive it will be the first place a person interested in Ms. Harlow will go for information.  Petitioner purchased the vintage magazines and the Harlow photographs to add

_____

[24]Petitioner failed to explain how groups in Exhibit 34-J relate to the two categories of assets petitioner acquired in 2003 that are on petitioner's Schedule C depreciation schedule. However, we were able to discern how Exhibit 34-J relates to petitioner's depreciation schedule by totaling amounts for each group in Exhibit 34-J and matching those totals with categories on petitioner's depreciation schedule.  This exercise revealed that petitioner also spent (1) $5,762 on books for his projects and for general research and (2) $7,360 on three autographed photos of Ms. Harlow, but deducted depreciation with respect to these items on his Schedule A, Itemized Deductions.  Respondent made no adjustments to petitioner's Schedule A except a computational adjustment and has not raised any issue regarding the propriety of splitting cost recovery deductions with respect to assets related to Ms. Harlow between the 2003 Schedule A and Schedule C.  Exhibit 34-J also reveals that petitioner spent $2,493 on photos and $5,467 on magazines mostly from the 1930s, but it is not clear whether petitioner claimed any deductions with respect to these materials.

to his already extensive collection of Harlow material. Petitioner did not prove that the photographs or magazines he acquired in 2002 and 2003, which he kept in archival sleeves, are assets that have a limited economic useful life or are subject to wear and tear, decay, or obsolescence as a result of their use, if any, in petitioner's Schedule C activity. Moreover, while the items that petitioner added to his Harlow library related to one of petitioner's existing projects, petitioner has failed to demonstrate how those items were "used" in his business.[25] The record simply establishes that petitioner acquired the items to add to his Harlow library and that the items may be of use to petitioner in his Schedule C activity if, as, and when he is able to market his idea for a Harlow book, film, script, or screenplay. In short, petitioner, who bears the burden of proof, see Rule 142(a), has failed to convince us that the assets in question were not acquired primarily for his personal use and enjoyment, that the assets were actually placed into service in his Schedule C activity, or that the assets were depreciable or amortizable.

---

[25]Mr. Vieira credibly testified that he turned to petitioner's research library (in years before 2003) for photographs and quotes from the Harlow period when he worked on his books about Hollywood history and that he actually compensated petitioner, to the tune of $80, for the right to use some of petitioner's Harlow materials. We infer from the record, however, that the items used were not the items acquired in 2002 and 2003 that are at issue here.

With respect to the non-Harlow items designated "General ongoing research", petitioner did not introduce evidence to identify specifically what these items were or how the items were used, if at all, in his Schedule C business activity. At the same time, the descriptions of items, for example, "Magazine" or "Photo" were generic and suggest that the purchased items could have been for amusement and entertainment rather than for business. Without meaningful evidence identifying with specificity the items purchased and their connection with petitioner's Schedule C business activity, we simply cannot conclude that the items in question were properly depreciated or amortized during 2003. Accordingly, we sustain respondent's disallowance of the cost recovery deduction with respect to items designated "General ongoing research". See sec. 262(a); sec. 1.167(a)-1(a), Income Tax Regs.

The last group, the uncategorized items, included several items: Two admission tickets to a Titanic exhibition, a $7 admission to the Rose Bowl Swap Meet, a $190 warranty for a TV, a $34 Sears maintenance bill for a vacuum cleaner, two admissions totaling $60 to Knott's Berry Farm, and $325 for gym membership dues.[26] With the possible exception of the Titanic exhibition

---

[26]Petitioner asserts that none of those items were included in the Schedule C deductions. However, the total for the category "Dues and periodicals" appears to include these items, and the total for that group on Exhibit 34-J in turn, equals the

(continued...)

tickets, there is no credible evidence in the record that any of these expenditures were for business assets that are depreciable.

With respect to the Titanic exhibition tickets, although petitioner credibly testified that he had sold documentary footage involving the Titanic and that he continues to pursue his Titanic project, he did not show (1) how the two admission tickets were related, if at all, to the project, and (2) whether the tickets were property for which a depreciation or amortization deduction was appropriate.  In addition, the purchase of the second ticket suggests the exhibition visit was social, and petitioner failed to offer any credible evidence regarding the business purpose of the visit.

We sustain respondent's determination with respect to the deductions relating to assets acquired in 2003.

> 2.  Expenditures With Respect to Assets Purchased in 2000-2002
>
> a.  Promotion, Goodwill, and Promotion/Goodwill (2000-2002)[27]

Ms. Vargas testified that the promotion/goodwill category included self-promoting parties, meals, and other forms of building petitioner's business.  Petitioner testified generally

---

[26](...continued)
cost basis for the category "Vint. magazine-library" on the depreciation schedule.

[27]The years in parenthesis indicate when petitioner acquired the particular category of assets.  The headings correspond to the lines on the depreciation schedule.

that the 2001 promotion category included the costs of flowers, wine, and "things to build relationships."  On the basis of the very sparse and general record, we are unable to conclude that the expenditures included in this category directly relate to petitioner's business and are not personal or that the expenditures generated depreciable assets.  We sustain respondent's determination with respect to this category.

### b.    Furniture and Fixtures (2000)

Petitioner testified that in 2000 he purchased bookshelves and filing cabinets, but he did not testify what these items were used for; nor did he introduce any receipts to substantiate the nature of the items purchased.  The record contains no evidence to establish that petitioner used the items in his business and not as household items.  Accordingly, we sustain respondent's determination with respect to this category.  See sec. 262(a); sec. 1.167(a)-1(a), Income Tax Regs.

### c.    Salary Promotion (2001), Research Library (2002)

Petitioner offered no testimony regarding these expenditure categories.  Because petitioner did not prove what items he acquired or their relationship, if any, to his Schedule C activity, we sustain respondent's determination with respect to these categories.

#### d.  Books (2001)

Although petitioner did not introduce into evidence the list of books he purchased in 2001, he testified that his research library contains books about the Titanic, Calamity Jane, The Black Donnellys, and Joan of Arc.  When testifying about the expenditures categorized as "books" purchased in 2001, petitioner stated that this category includes "all the books that I've just described earlier."  However, the record contains no specifics on the assets purchased.  The record does not allow us to conclude that the books purchased were not for amusement and entertainment or for general personal use.  Accordingly, we sustain respondent's determination with respect to this category.

#### e.  Artist Supply (2000), Research/Tapes/Theater (2000), Photos (2001), Dues and Periodicals (2001), Animation Art (2001), Research Photo (2002), Reference Library (2002)

Petitioner testified with varying degrees of certainty what expenses were grouped under these categories.  With respect to artist supplies purchased in 2000, petitioner testified that the category includes items to generate design work, characters, and backgrounds.  Petitioner also testified that the category "photos", reflecting items purchased during 2001, consisted of modern prints, with the cost of up to $25 and that the category "Research/tapes/theater", reflecting expenditures made during 2002, included CDs and films of the period and movie theater admissions (I "[was] going to the movie theater and studying what

I'm watching.")  With respect to the animation art category, petitioner testified that the category may include cells from past animated features that he would use for his projects, but he only loosely connected the category with the Calamity Jane project.[28]

Petitioner's testimony regarding dues and periodicals and animation art acquired in 2001 was even less certain.  He testified that dues and periodicals probably consisted of newspapers and magazines for his research library.  Petitioner offered no evidence whatsoever to identify the items he purchased in 2002 and depreciated under the research photo category; he testified only that the items in question were probably archival photographs acquired for specific projects.  Petitioner testified that the items acquired in 2002 and categorized as "reference library" probably included magazine articles, looseleaf articles, or newspaper articles.

Although petitioner described in detail his various projects and testified generally that his research library contains photographs, books, magazines, audio materials, and DVDs related to his projects, he did not introduce any evidence identifying the specific items he acquired and how those items related to his business.  On this sparse and unhelpful record we cannot find

---

[28]Petitioner testified that "Animation art * * * may be cells from past animated features that would be used in conjunction with something like Calamity Jane."

that these expenditures were directly related to petitioner's business and were not personal expenses or costs of general amusement, entertainment, or recreation, which ordinarily are not deductible. See secs. 262, 274(a). Petitioner's broad testimony that he was engaged in projects and that his research library contains materials related to them does not prove that the unknown assets included in these categories were business assets that were properly depreciated or amortized. Because petitioner bears the burden of proof, see Rule 142(a), and failed to carry it, we sustain respondent's determination.

## VI. Conclusion

We have considered all remaining arguments made by the parties, and to the extent not discussed above, we reject those arguments as irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.